**Opinion filed September 29, 2023**



In The

# Eleventh Court of Appeals

_____

## No. 11-19-00274-CR

_____

## DIMAS GONZALES, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 106th District Court**
**Dawson County, Texas**
**Trial Court Cause No. 15-7565**

## O P I N I O N

The jury convicted Dimas Gonzales[1] of first-degree murder and assessed his punishment at confinement for a term of forty-five years in the Institutional Division of the Texas Department of Criminal Justice. Appellant challenges his conviction in twenty-two issues.

---

[1]We note that Appellant's name as it appears in the indictment is "Dimas Gonzales" and that the name reflected in the judgment is "Dimas Gonzalez."

Appellant's fifteenth, sixteenth, and seventeenth issues concern the manner in which the trial court conducted the initial hearing on Appellant's motion for new trial. We previously abated this appeal and remanded this cause to the trial court to conduct a new evidentiary hearing on Appellant's motion for new trial. A copy of our August 12, 2021, abatement order is attached as an appendix to this opinion. We expressly incorporate the abatement order as a part of the opinion in this appeal.

In our abatement order, we determined that the trial court abused its discretion in conducting an evidentiary hearing on a motion for new trial when it (1) held the hearing in a private conference room, rather than a public courtroom; and (2) denied Appellant's bench warrant and required Appellant to appear at the hearing via telephone. We sustained Appellant's fifteenth through seventeenth issues by ordering that the trial court conduct a new evidentiary hearing on Appellant's motion for new trial that complied with Appellant's Sixth Amendment right to a public hearing and statutory right under Article 33.03 of the Texas Code of Criminal Procedure to be "personally present" at his motion-for-new-trial hearing. In response to our abatement order, the trial court conducted a second evidentiary hearing on Appellant's motion for new trial. The trial court denied Appellant's motion after the second evidentiary hearing. On the reinstatement of this appeal, we now address Appellant's nineteen remaining issues. We modify and affirm.

*Background Facts*

A summary of the events leading up to the incident at issue, and the connections between the parties involved, is necessary. Nichole Canady and Appellant's nephew, Bernardo "Bernie" Gonzalez, had been dating for a year. They were living together in an efficiency apartment on Nichole's aunt's property, and Bernie had received permission from Nichole's parents to propose to her. Bernie also had permission from Nichole and her parents to drive Nichole's car. In

2

March 2015, Bernie crashed Nichole's Ford Fusion into a tree in Lamesa. The car was totaled.

Nichole purchased a Mercury Montego to replace the Ford Fusion. On May 17, 2015, about two months after the Ford Fusion crash, Bernie was driving the Montego, with his brother Nicholas Gonzalez as a passenger, and fell asleep at the wheel. After Bernie awoke and "jerked the wheel" back towards the road, the vehicle rolled onto its passenger side and incurred extensive damage before falling back onto all four tires.

Bernie called Nichole and told her about the accident. Nichole broke up with Bernie at that time, telling him that he needed to remove his belongings from the apartment. Once he returned to the apartment, Bernie gathered his things and asked Gregorio Gonzalez, which is Bernie and Nicholas's father, to pick them up.

Nichole called her mother, Mistry Canady, at around 5:00 p.m. to tell her that Bernie had crashed the Montego. Nichole's father, Bernard Canady, called Mistry at around 8:00 p.m. to tell her that he was on his way home from work. When Bernard arrived home at around 8:30 p.m., Mistry told him that Bernie had crashed another vehicle. Mistry testified that Bernard was "upset" and quickly left for Nichole's apartment to look at the damage to the vehicle. Mistry tried calling Bernard twice after he left, but he did not answer the phone. Mistry also called Nichole to tell her that her father was on the way. Nichole testified that Mistry seemed worried about Bernard when she called.

Nichole testified that Bernard arrived at her apartment when it was still "kind of daylight" to look at the damage to the Montego. Nichole estimated that Bernard arrived about fifteen-to-twenty minutes after Bernie left. Nichole testified that Bernard was "mad" about the car. Constella Bolton, Nichole's aunt, was home during this conversation. Constella knew that Bernard was upset about the car because he was yelling and using profanity.

3

Bernard told Nichole that he was going to see Bernie and asked Nichole to come with him. Nichole asked her father not to go, told him that she did not want to go with him, and stayed behind as he left. Word quickly spread about Bernard's intent to confront Bernie. Nichole called Bernie to let him know that Bernard was on his way. Constella called Mistry and told her that they needed to find Bernard; and Constella asked her cousin, Michael Manuel, and her father, Garfield Bolton, to check on Bernard.

Meanwhile, Gregorio had taken Bernie and Nicholas to Maria Gonzalez's home (the site of the incident). Maria, Appellant and Gregorio's mother, allowed both Appellant and Gregorio to live on her property.

Maria's property was on a farm-to-market road near Lamesa. There were fields of crops and a bar ditch across the road. The property was fenced in and had gates that were usually kept open. The property had two buildings: the "main house" and the "back house," which was a one-bedroom house behind the main house. Both houses faced the farm-to-market road. The property had one driveway on the eastern side of the main house and one driveway in front of the main house. There was also a dirt road leading to the back house.

Gregorio parked his pickup on the driveway to the east of the main house. Maria was inside the main house, and Appellant was in his pickup listening to music and drinking beer. Appellant had parked his pickup near the back house, with the front of the pickup facing the farm-to-market road.

Shortly after arriving at Maria's, Bernie received a call from Nichole. Nichole told Bernie that Bernard was on his way to Maria's house. Bernie testified that Nichole was crying and apologizing to Bernie for her father. Nicholas noticed Bernie acting "[w]orried [and] scared" while on the phone.

Bernard quickly pulled into Maria's property while Bernie was standing outside and on the phone with Nichole. Bernie testified that Bernard pulled into the

4

driveway in front of the main house, almost hitting Bernie in the process. Nicholas and Gregorio testified that Bernard parked towards the side of the main house.

Bernard got out of his pickup and began yelling at Bernie. Nicholas testified that Bernard told Bernie he needed to pay for the car, and that when Bernie told Bernard he did not want any "problems," Bernard responded, "we're going to have problems because of what you did." Bernie testified that Bernard threatened to "kick [Bernie's] a-s." Gregorio tried to deescalate the situation, but Bernard hit Bernie in the face. Bernie testified that he fell into the tree in front of the main house, and that Gregorio was holding Bernard down and was telling him to calm down by the time Bernie got up.

Gregorio testified that he "threw Bernard to the ground" and that Bernard was hitting him and attempting to flip him over. Bernie and Nicholas began hitting Bernard while Gregorio had him on the ground because Bernard was biting Gregorio in the chest. Nicholas testified that Gregorio then let Bernard get up and told him that "it didn't need to be like this, they could have came [sic] and talked and a fight didn't have to break out, talk to him like real men."

Bernard went back to his pickup, grabbed something, and approached Bernie. Nicholas testified that he saw Bernard grab an "object," but could not tell what he was holding. Bernie and Gregorio testified that Bernard was holding a knife, and Bernie described it as a pocketknife with a gray and black handle. Bernie testified that he challenged Bernard to "come on, stab me, m----------r." Bernie testified that Bernard only pointed the pocketknife at him, but Nicholas and Gregorio testified that Bernard lunged at Bernie. Gregorio told Bernard not to stab his son. Maria was "[s]creaming hysterically" on the porch.

Bernie is the only person who testified that Appellant was close enough to the fight to speak to Bernard when he had the pocketknife out. Bernie testified that Appellant told Bernard to "[g]et out of here m----------r," to which Bernard

5

responded "[n]o, I'm going to kill these m----------s, they jumped me." Bernie testified that Appellant then walked towards the back house to get his firearm.

Bernie grabbed a brick and attempted to throw it at Bernard, but Gregorio hit the brick out of his hand. Bernard walked back to his pickup and said that he had "more people coming" to Maria's property. Bernie testified that Bernard said the Gonzalez family was going to "pay for what [they] did to him."

Bernard reversed his pickup out of Maria's property and onto the farm-to-market road. Bernie picked the brick up again and threw it at Bernard's pickup. Testimony differed as to whether Bernard was driving away or already parked on the road when Bernie threw the brick.[2] Bernard stepped out of his pickup and threw the brick back at Bernie. Nicholas and Bernie testified that the brick bounced off the property fence and hit Bernie in the eye.

After Bernard threw the brick back, he and Bernie began fighting again by the property gate. Nicholas testified that Bernard was bigger than Bernie, and it looked like Bernard was "winning" the fight. Bernie testified that he was trying to shield his face from Bernard hitting him and that Nicholas was hitting Bernard's side, trying to defend Bernie.

Nicholas and Gregorio testified that Appellant would have been able to see and hear the fighting and screaming. Appellant approached from the back house with his firearm, an "AK-47," aimed at Bernard. Appellant told his family to "get out of the way" before he began shooting. The different accounts of the incident that followed are summarized below.

---

[2]Nicholas testified that Bernard was still driving away when the brick hit his pickup and that Bernard stopped his pickup at an angle, with the passenger side facing Maria's property. Bernie and Gregorio testified that Bernard had already parked his pickup on the road when Bernie threw the brick.

*Nicholas Gonzalez*

Nicholas's testimony placed Bernard on the passenger side of Benard's pickup when Appellant started firing. Bernard ran towards the field across the street from the house. Appellant continued shooting as Bernard ran. Appellant went "in the road" towards Bernard as he continued shooting. Bernard did not make it into the field and fell next to the roadway.

Nicholas heard Gregorio tell Appellant to put his firearm down. Nicholas saw Appellant set his firearm down in "some weeds" by his pickup. Nicholas then saw four "African Americans" in a green pickup park beside Bernard's body, "checking" Bernard's pickup.

The State questioned Nicholas about the discrepancies between his testimony and his written statement taken a couple of hours after the incident. Nicholas testified that he did not tell the truth "through the whole statement" he gave. The State noted that Nicholas's statement did not mention Bernard going to his pickup to grab an "object," and specifically said that Bernard did not have a knife. Nicholas's statement placed Bernard on the driver's side of his pickup when Appellant began shooting, and Nicholas stated that "everyone" was telling Appellant to stop shooting. Nicholas did not state that Bernard fell in the road, but rather in the field across the road.

*Bernie Gonzalez*

Bernie testified that Appellant fired two or three shots while standing inside Maria's property line. Bernard began running towards his pickup when Appellant began shooting. Bernard ran behind his pickup and attempted to climb inside while Appellant fired at the pickup. Bernard then ran to the front of his pickup. Appellant briefly stopped shooting at the back of the pickup and then began shooting at the front of the pickup. Bernie saw Bernard limping in the field across the street, where he soon fell. Appellant asked whether Bernard was still moving. Gregorio asked

Appellant, "Why did you shoot him, brother? He was running. He was already leaving." Appellant responded that Bernard "shouldn't have come in [his] yard trying to stab [his] nephew and trying to start stuff."

Bernie called 9-1-1, and that call was admitted and played for the jury. In the call, Bernie asks for an ambulance and says that his uncle shot his ex-girlfriend's father because he was "harassing [Bernie's] family," "would not leave," "hit [Bernie] with a brick," and "pulled a knife out on [Bernie] and everything." As Bernie was speaking with the 9-1-1 dispatcher, he noticed more people arriving on the scene and said, "[t]here's more people coming into our yard right now . . . they got guns, sir."

Bernie testified that four people drove up in a red Ford F-150 and walked into Maria's yard but left when law enforcement arrived. Bernie recalled these people were "all over Bernard's truck" looking for him. In contrast to his 9-1-1 call, Bernie testified that Appellant was the only person he saw with a firearm.

The State questioned Bernie about inconsistencies between his testimony and the written statement he gave shortly after the incident. Bernie testified that "[a] lot of stuff is left out" of his statement. The State noted that Bernie's statement painted a different picture of the incident—Bernie stated that Bernard parked his pickup in the driveway behind Gregorio's pickup; that Gregorio told Bernie and Nicholas "that's enough" when they were hitting Bernard on the ground; and that Bernard was driving away when Bernie threw the brick at his pickup.

Further, Bernie stated that Appellant was shooting at Bernard as he ran, and that Appellant was in the middle of the road when he fired. Bernie stated that Bernard was crawling, "groaning and moaning," and Appellant asked whether Bernard was still alive—not whether he was still moving. Bernie stated that Appellant shot Bernard again when Bernard was on the "floor," and that Appellant

8

was "in a rage" when shooting. Bernie's statement says, "Bernard was trying to get away on foot and was not doing anything threatening when he was being shot at."

*Gregorio Gonzalez*

Gregorio's testimony placed Bernard in the road and walking towards the property gate when Appellant began firing. Appellant was standing in the driveway when he fired the first five shots. Bernard ran around the back of his pickup and tried to get into the driver's side but was unable to. Appellant moved to the dumpster on the property as he continued shooting. Gregorio testified that Appellant was never in the road when shooting.

Gregorio saw Bernard "walking away" before he fell "on the other side of the street" and into the bar ditch. Gregorio told Appellant to "put the gun down" because law enforcement was arriving, and Gregorio did not want them to shoot Appellant. Gregorio then saw two Black men arrive in a pickup and walk into Maria's yard as law enforcement arrived.

The State questioned Gregorio about the inconsistencies between his testimony and his recorded interview taken shortly after the incident. The State noted that Gregorio did not say that Bernard was walking towards the property gate when Appellant started firing and that, while Gregorio testified that Appellant was not in the road while shooting, Gregorio stated in his interview that Appellant was walking towards Bernard's pickup while he was shooting. Further, Gregorio testified that he did not recall Appellant firing, pausing, and firing again. However, Gregorio stated in his interview that Appellant "shot, then walked around and shot again." Gregorio stated in his interview that he was thinking "s--t, Bro, you already shot him, leave it alone, you already shot him" and that he tried to grab the firearm away from Appellant to stop him from firing more shots. When he testified, Gregorio denied grabbing the firearm.

9

*Kenneth Riddle*

Only one person outside of the Gonzalez family testified as an eyewitness to the actual shooting. Kenneth Riddle was driving on the farm-to-market road around 8:00 p.m. Riddle testified that it was "dusky-dark" outside. Riddle noticed that a pickup was in the middle of the road and realized he would have to go around it when he saw two people walking towards the house nearby. Riddle described the two people as one person of smaller stature, possibly a woman, and one man. The man walked back into the road and around the pickup, ducking behind it. Riddle saw sparks coming off the pavement, turned his radio off, and heard several rapid gunshots.

The man behind the pickup "stood up and [] stretched his arm out and then ducked back down again because shots rang out again." Riddle could not see whether the man had anything in his hands. Riddle backed his vehicle up to avoid the shooting and watched the man behind the pickup start running down the bar ditch. After more shots were fired, the man fell.

After the man fell, "the one that was doing the shooting walked right out in the middle of the pavement, pointed down towards the bar ditch, shot two more times, turned around and walked back toward the house." Defense counsel noted that, when Riddle had a documented conversation with a member of the District Attorney's office prior to trial, Riddle did not tell them that the person with the firearm went into the road and fired twice while the man he was shooting at was on the ground.

*Post-Incident Witnesses*

Several witnesses testified about the events that occurred after the incident. Officer Kelly Scott Bradley with the Lamesa Police Department testified that law enforcement responded to an "extremely chaotic" scene. Chief Deputy Josh Peterson with the Dawson County Sheriff's Office testified that he was dispatched

10

to the scene and that there were "several people in the roadway and numerous people in the area of the yard of the residence." Chief Deputy Peterson said that there were "[a]t least ten or more" people in the yard.

Manuel, Bernard's cousin, testified that he went to Maria's house because Constella had called him and told him that Bernard was "going to find out why Bernie was tearing up Nichole's car." Manuel drove to Maria's property with his friend, Robert Maxwell. Maxwell testified that Manuel told him they needed to find Bernard because he was "getting into it with somebody."

Manuel parked his vehicle in the middle of the street and ran to Bernard's pickup, looking for him. Manuel noticed bullet holes in the pickup and gas pouring onto the street. Manuel ran towards a group of people near the fence, trying to find Bernard, and the group of people began running towards the house. Manuel heard one person say that they thought Manuel had a gun, but Manuel testified that he only had a cell phone in his hand. Manuel also saw Constella's father, Garfield, at the scene.

Mistry picked Constella and Nichole up and drove to Maria's house. Police and an ambulance were on the scene by the time they arrived. Constella testified that Mistry parked in the grass across the street from Maria's home. Constella noticed that the driver's side door to Bernard's pickup was open, and his body was "in the weeds" by the passenger side of Mistry's car.

Several first responders testified that Bernard was face down in the bar ditch and that his hat and sunglasses were near his body. Testifying officers estimated that Bernard's feet were anywhere from less than a foot to ten feet away from the edge of the asphalt.

Officer Isaac Liscano with the Lamesa Police Department testified that officers recovered two empty ammunition boxes, ten bullets, and three beer cans from Appellant's pickup. Deputy James Davis with the Dawson County Sheriff's

Office transported Appellant from the scene and testified that he could smell beer on Appellant's person.

Officer Bradley testified that most of the shell casings recovered were in "the grass between the fog line and the dumpster, headed up toward the pickup truck, and then a couple in front of the pickup truck." Two shell casings were in the middle of the road. Chief Deputy Peterson testified that Bernard's pickup had "several bullet holes" in it. Officer Bradley testified that the bullet holes on the passenger side of Bernard's pickup were between twenty-two and thirty-six inches from the ground. The bullet holes on the front of Bernard's pickup were between nine and one-half and twelve inches from the ground. Officer Bradley noted three ricochet marks on the pavement.

Lieutenant Tommy Arguijo with the Lamesa Police Department took Nicholas and Bernie's written statements. Lieutenant Arguijo testified that Bernie and Gregorio had several injuries, including an injury on Bernie's right eye and a bite mark on Gregorio's chest.

Candace Perez (Xandi), a nurse at the hospital Bernard was taken to, testified that she assisted in assessing Bernard's injuries when he first arrived at the hospital. Perez said that the medical team rolled Bernard onto his side to assess the injuries on the back of his body. Perez testified that a pocketknife fell from Bernard's person when the medical team rolled him onto his side. Photographs of the recovered pocketknife, which had a gray and black handle, were admitted.

Dr. Thomas Parsons was the forensic pathologist who performed Bernard's autopsy. Dr. Parsons testified that the shots that hit Bernard were labelled as fired from an "undetermined range" because Bernard's clothing made it difficult to determine how far Appellant was from Bernard when he shot. Dr. Parsons documented four gunshot wounds on Bernard's person, with three entering through Bernard's buttocks or legs and one entering Bernard's torso.

The direction of one bullet, entering Bernard's lower right buttock and going through his femur, indicated that the bullet entered from "back to front." The fatal bullet went up through Bernard's body and hit several vital organs. Dr. Parsons testified that the path of the fatal bullet indicated that the muzzle of the firearm would have been below the entry point and going from "front to back."

Dr. Parsons testified that the firearm's muzzle would have been below Bernard's waist when the fatal wound occurred. Dr. Parsons testified that this wound could have been consistent with Bernard lying down on the ground. However, Dr. Parsons also testified that Bernard could have been running when this wound occurred. Dr. Parsons testified that the injuries caused by the wound would have prevented Bernard from running more than ten yards before falling.

Darrell Morgan, a Texas Department of Public Safety firearm and tool mark examiner, examined Appellant's firearm. Morgan testified that the firearm's magazine could hold thirty cartridges at a time, that thirteen unspent cartridges remained in the magazine, and fourteen spent shell casings were recovered from the scene. Morgan testified that Appellant's firearm was a semi-automatic rifle, and that the trigger would have needed to be pulled to fire every shot.

*Analysis*

*Sufficiency of the Evidence*

In Appellant's sixth and seventh issues, he asserts the evidence is legally insufficient to support the jury's verdict. In his sixth issue, he generally contends that the evidence is insufficient to support the jury's verdict. Appellant's seventh issue challenges the sufficiency of the evidence with respect to the State's burden to disprove the defense of a third person.

Defense of a third person is a fact issue to be determined by the jury, and a jury's verdict of guilt is an implicit finding that it rejected a defendant's theory of defense of another. *See Broughton v. State*, 569 S.W.3d 592, 608–09 (Tex. Crim.

13

App. 2018); *Saxton v. State*, 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991). For a defense of third person claim, the defendant has the burden of producing some evidence to support the claim. *Broughton*, 569 S.W.3d at 608; *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *see also Saxton*, 804 S.W.2d at 913–14 (contrasting affirmative defenses and explaining how burdens shift for self-defense). If the defendant produces some evidence, the State has "the burden of persuasion to disprove the raised defense." *Zuliani*, 97 S.W.3d at 594. The State's burden does not require the production of any additional evidence; instead, "it requires only that the State prove its case beyond a reasonable doubt." *Id.*; *see Saxton*, 804 S.W.2d at 913. "Because the State bears the burden of persuasion to disprove" such a claim "by establishing its case beyond a reasonable doubt, we review both legal and factual sufficiency challenges to the jury's rejection of such a defense under" the legal sufficiency standard. *Smith v. State*, 355 S.W.3d 138, 145 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *see also Saxton*, 804 S.W.3d at 914.

We review a sufficiency of the evidence issue under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.–Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Thus, when reviewing the sufficiency of the evidence to support a conviction involving a claim of defense of a third person, we review the sufficiency of the evidence to support a jury's rejection of a defendant's defense of a third person theory by examining all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense and also could have found against the defendant on the

defense issue beyond a reasonable doubt. *Saxton*, 804 S.W.2d at 914 (citing *Jackson*, 443 U.S. 307).

When conducting a sufficiency review, we defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. TEX. CODE CRIM. PROC. ANN. art. 38.04 (West 1979); *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778. When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict and defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

It is not necessary that the evidence directly proves the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13. Because evidence must be considered cumulatively, appellate courts are not permitted to use a "divide and conquer" strategy for evaluating the sufficiency of the evidence. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). Instead, appellate courts must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017).

The indictment charged Appellant with murder by intentionally and knowingly causing the death of Bernard Canady by shooting him with a deadly weapon—a firearm. A person commits the offense of first-degree murder if the person intentionally or knowingly causes the death of an individual. TEX. PENAL

CODE ANN. § 19.02(b)(1) (West 2019).[3]  Appellant concedes that "the identity of the person who shot [Bernard] Canady was never in question."  It is Appellant's contention that he "armed himself and defended Bernie and his home" from Bernard, who, as Bernie testified, had threatened to kill the Gonzalez family.  Therefore, Appellant asserts, there was insufficient evidence to support the jury's verdict because he was acting in defense of a third person.

A person is justified in using force or deadly force against another to protect a third person if:

> (1) under the circumstances as the actor reasonably believes them to be, the actor would be justified under Section 9.31 or 9.32 in using force or deadly force to protect himself against the unlawful force or unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect; and
>
> (2) the actor reasonably believes that his intervention is immediately necessary to protect the third person.

PENAL § 9.33.

Defense of a third person is a justification defense: "Chapter 9 of the Penal Code recognizes certain justifications that, under Section 2.03, are defenses to prosecution." *Alonzo v. State*, 353 S.W.3d 778, 781 (Tex. Crim. App. 2011); *see* PENAL § 2.03 (West 2021).  As we have stated, when a defendant asserts a justification defense, the defendant bears the burden to produce evidence supporting his defense, and the State bears the burden of persuasion to disprove the defendant's raised issue.  *See Braughton*, 569 S.W.3d at 608–09 (citing *Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 913–14.  "If a fact-finder believes that a defendant's actions are justified under Chapter 9 (or has a reasonable doubt that the actions were

---

[3]The judgment of conviction lists Section 19.03 of the Texas Penal Code (Capital Murder) as the statute for which Appellant was convicted.  However, Appellant was both charged and convicted of conduct set out in Section 19.02(b)(1) of the Texas Penal Code.

justified under Chapter 9), the plain meaning of Sections 9.02 and 2.03 is that the fact-finder may not convict the defendant for an offense based on those actions." *Alonzo*, 353 S.W.3d at 781.

Whether a defendant was acting in defense of a third person is a fact issue for the jury to determine. *Braughton*, 569 S.W.3d at 609 (citing *Saxton*, 804 S.W.2d at 914). Here, the trial court's charge included an instruction for defense of a third person, and the jury's guilty verdict was an "implicit finding" rejecting Appellant's defensive theory. *See id.* We defer to the jury's fact determinations and will not disturb the jury's rejection of Appellant's defense of a third person theory on appeal unless no rational juror could have done so. *See id.* at 608; *see also Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

The focus of defense of a third person is upon what the actor reasonably believes concerning the situation of the third person. *Morales v. State*, 357 S.W.3d 1, 8 (Tex. Crim. App. 2011). Appellant contends there was ample evidence for the jury to find that he reasonably believed deadly force was immediately necessary to protect a third person. Specifically, Appellant points to (1) Bernard being "armed with [a] truck, a knife, a brick, and his fists" against Bernie; (2) Appellant's mother "hysterically" screaming; and (3) Bernie hearing Bernard say he was "going to kill these m-----------s." However, Appellant's defensive claim "hinge[s] almost entirely on the credibility of the witnesses who viewed the events." *See Braughton*, 569 S.W.3d at 610. As such, Appellant's claim of defense of a third person was inherently a credibility question for the jury to resolve. *See Brooks*, 323 S.W.3d at 899 ("the jury is the sole judge of the witnesses' credibility"). "[B]y its implicit rejection of appellant's defense[] in finding him guilty, the jury necessarily signaled its disbelief in this testimony as lacking in credibility." *See Braughton*, 569 S.W.3d at 611; *Saxton*, 804 S.W.2d at 913–14 (assessment of credibility of defensive

evidence is "solely within the jury's province and the jury is free to accept or reject the defensive evidence").

Four eyewitnesses who testified at trial said that Bernard was running away from the Gonzalez home while Appellant was firing the AK-47. Bernie and Gregorio testified that Bernard had put the pocketknife away by the time the shooting occurred. Riddle testified that Appellant walked towards the bar ditch and shot Bernard twice after he had fallen to the ground. Bernie testified that Gregorio told Appellant that he did not have to shoot at Bernard because he was already leaving. Bernie's statement was that "Bernard was trying to get away on foot and was not doing anything threatening when he was being shot at." Accordingly, there is sufficient evidence in the record to rationally support the jury's rejection of Appellant's claim of defense of a third person and a rational juror could have reasonably concluded that Bernie was not in "immediate danger" when Appellant began shooting. *See* PENAL § 9.33. As such, there was sufficient evidence in the record to support the jury's rejection of Appellant's defensive claim.

Although Appellant's sixth and seventh issues are limited to a legal sufficiency challenge, Appellant submitted a supplemental letter brief to this court contending that "factual sufficiency review still applies in cases raising a defense." Appellant contends that the *Zuliani* "factual-based" sufficiency review should be conducted when a defendant's defensive theory is rejected. *See Zuliani*, 97 S.W.3d at 594. Appellant's contention is incorrect.

Appellant cites *Butcher v. State* in support of his proposition. *See Butcher v. State*, 454 S.W.3d 13 (Tex. Crim. App. 2015). However, *Butcher* dealt with an affirmative defense to aggravated kidnapping. *Id.* at 15. Affirmative defenses can be analyzed for factual sufficiency post-*Brooks*. *Id.* at 19; *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013); *see* PENAL § 2.04(b), (d). In contrast, justification defenses, like defense of a third person, invoke the single *Jackson*

18

standard. *Saxton*, 804 S.W.2d at 914; *see also Braughton*, 569 S.W.3d at 608–09 (citing *Saxton*, 804 S.W.2d at 914); *Matlock*, 392 S.W.3d at 667 ("The *Jackson* standard of review is that required for criminal cases when the standard of proof is that of 'beyond a reasonable doubt.'"). As we have previously noted, the evidence is legally sufficient to support the jury's verdict under the *Jackson* standard.

We overrule Appellant's sixth and seventh issues.

*Jury Deliberations*

Appellant's first five issues center around the manner in which the trial court addressed jury deliberations for the guilt/innocence phase of trial. Specifically, Appellant asserts that the trial court conducted an improper poll of the jury, and in doing so, the trial court commented on the weight of the evidence and by its instructions coerced the jury, thereby resulting in Appellant's conviction by a nonunanimous verdict.

The jury began deliberations at 4:50 p.m. on June 18, 2019. At 6:04 p.m., the jury reentered the courtroom and advised the trial court that it had reached a verdict. The trial court then read the jury's verdict of guilty and noted that it was signed by the presiding juror. Afterwards, defense counsel requested that the trial court poll the jury. The trial court began polling the jurors, and the first three jurors confirmed that the verdict was theirs. However, Juror Eleven, the fourth juror polled, replied "No" when asked if the verdict was his. The trial court continued polling the jury and confirmed with the remaining jurors that the verdict was theirs before returning to Juror Eleven to question him further.

The conversation between the trial court and Juror Eleven was as follows:

THE COURT: And [Juror Eleven], this is not your verdict; is --

JUROR [ELEVEN]: Yes.

THE COURT: -- this correct? It is or is not?

JUROR [ELEVEN]: No, it's not.

> THE COURT: Not your verdict.  Okay.  Ask the Jury to return to the jury room, then, and continue to deliberate until you have a unanimous verdict.

The jury left the courtroom to deliberate further at 6:06 p.m. and returned twenty-six minutes later with a guilty verdict.  The trial court again confirmed that the guilty verdict was correct and again polled the jury upon defense counsel's request.  After all twelve jurors confirmed that the verdict was theirs, the trial court accepted the verdict and dismissed the jury until the following morning.

*Jury Polling Procedure*

In Appellant's fourth issue, he contends that the trial court failed to follow the proper jury polling procedure as outlined in Article 37.05(a) of the Code of Criminal Procedure.  *See* CODE CRIM. art. 37.05(a) (West Supp. 2022).  Article 37.05(a) provides as follows:

> The State and the defendant each have the right to have the jury polled, which is done by calling separately the name or identification number of each juror and asking the juror if the verdict is the juror's.  If all jurors, when asked, answer in the affirmative, the verdict shall be entered upon the minutes; but if any juror answers in the negative, the jury shall retire again to consider its verdict.

*Id.*  Appellant asserts that Article 37.05 requires the jury to return to deliberations as soon as a single juror answers in the negative, and it instructs that the trial court cannot continue polling the remaining jurors after a juror indicates that the verdict is not his.  However, Appellant did not object or request that the trial court stop polling the remaining jurors when Juror Eleven initially answered in the negative.  "As a prerequisite to presenting a complaint for appellate review," a party must have made a timely request, objection, or motion to the trial court "with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context."  TEX. R. APP. P. 33.1(a)(1)(A).  As noted by the Texas Court of Criminal Appeals:

20

It is well-settled that the purpose of requiring a timely specific objection is to allow the trial court to have the opportunity to make a determination and ruling on the complained of point and then to proceed with the trial under the proper procedural and substantive manners, as appropriately corrected by the trial court. Thus, the trial court is allowed to correct the complained of error at that time and to then proceed with the trial.

*Janecka v. State*, 823 S.W.2d 232, 243–44 (Tex. Crim. App. 1990).

Any error in the jury polling process or procedure used by the trial court is forfeited if Appellant fails to object "when the trial court went beyond the scope of [A]rticle 37.05." *Barnett v. State*, 189 S.W.3d 272, 277 (Tex. Crim. App. 2006). The record before us does not demonstrate that Appellant's trial counsel made a contemporaneous objection to the trial court's polling procedure. Thus, Appellant did not apprise the trial court, as required to preserve this issue for review, of any complaint regarding the trial court's jury polling procedure or of his contention that the trial court was not permitted to question the remaining jurors after Juror Eleven answered in the negative. *See* TEX. R. APP. P. 33.1(a)(1)(A). Because Appellant did not timely object to the trial court's polling procedure, we overrule Appellant's fourth issue.

*Jury Coercion and Commenting on the Weight of the Evidence*

In Appellant's first issue, he contends that the manner in which the trial court questioned Juror Eleven had a coercive effect on the jury. For this issue, Appellant's contentions are focused on the number of times that the trial court asked Juror Eleven if the verdict was his, and then instructing an 11-1 jury to return with a unanimous verdict. In his fifth issue, he asserts that the trial court's polling procedure constituted a comment on the weight of the evidence. For this issue, Appellant contends that the trial court commented on the weight of the evidence when it (1) requested that the jury return to the jury room to continue its deliberations until

the jurors had reached a unanimous verdict and (2) asked Juror Eleven to clarify whether it was his verdict.

Article 38.05 of the Texas Code of Criminal Procedure prohibits a trial judge from commenting on the weight of the evidence in criminal proceedings. CRIM. PROC. art. 38.05. In this regard, a trial judge must refrain from making any remark calculated to convey to the jury his opinion of the case. *Brown v. State*, 122 S.W.3d 794, 798 (Tex. Crim. App. 2003) (citing CRIM. PROC. art. 38.05). A trial court improperly comments on the weight of the evidence if it implies approval of the State's argument, indicates any disbelief in the defense's position, or diminishes the credibility of the defense's approach to the case. *Clark v. State*, 878 S.W.2d 224, 226 (Tex. App.—Dallas 1994, no pet.) (citing *Ward v. State*, 243 S.W.2d 695, 696–97 (Tex. Crim. App. 1951); *see McClory v. State*, 510 S.W.2d 932, 934 (Tex. Crim. App. 1974); *Arevalo v. State*, No. 11-22-00123-CR, 2023 WL 5622340, at *14 (Tex. App.—Eastland Aug. 31, 2023, no pet. h.). A trial court can be coercive in its instruction to continue deliberations if the instruction includes additional language which could be interpreted as bringing pressure to bear on the jury. *See Muniz v. State*, 573 S.W.2d 792, 794 (Tex. Crim. App. 1978).

Once again, Appellant did not make a contemporaneous objection with respect to the trial court's questioning of Juror Eleven.[4] As such, because Appellant did not apprise the trial court of his contention that its manner of questioning Juror Eleven was improper in any way, Appellant did not preserve these complaints for appellate review. *See Barnett*, 189 S.W.3d at 277.

Appellant cites *Brasfield v. U.S* in support of his proposition that "[i]nquiry into the numeric split of a jury is not allowed because it coerces the jurors in the

---

[4]During a hearing on his motion for new trial, Appellant elicited testimony from one of his trial attorneys stating that a conference occurred with the attorneys and the trial court concerning the need to make a further inquiry with respect to Juror Eleven. However, this purported conference is not supported by the contemporaneous reporter's record from when the jury returned its verdict.

minority." *Brasfield v. U.S.*, 272 U.S. 448, 450 (1926). However, the Texas Court of Criminal Appeals has declined to follow *Brasfield*, noting that "*Brasfield* created a prophylactic rule forbidding the federal trial courts from questioning the juries regarding numerical division. However, such a prophylactic rule is based upon the U.S. Supreme Court's exercise of supervisory powers and . . . simply has no application to [a] state proceeding." *Howard v. State*, 941 S.W.2d 102, 124 (Tex. Crim. App. 1996), *overruled on other grounds by Easley v. State*, 424 S.W.3d 535 (Tex. Crim. App. 2014).

Appellant also cites to *Barnett v. State* for the proposition that continuing to poll the jury after a lack of unanimity is revealed is coercive. *Barnett v. State*, 161 S.W.3d 128 (Tex. App.—Fort Worth 2005), *aff'd*, 189 S.W.3d 272 (Tex. Crim. App. 2006). In *Barnett*, the Fort Worth Court of Appeals held that the trial court's action of polling of the jury was coercive because it went beyond the scope of Article 37.05 in telling two hold-out jurors "'we do have a problem with both of you' and ask[ing] them whether, if sent back to the jury room to deliberate, they would be able to change their votes[.]" *Barnett*, 161 S.W.3d at 131, 134.

*Barnett* is readily distinguishable from the case before us. Here, when the trial court asked Juror Eleven more than once if the verdict was his, the record demonstrates that the trial court was attempting to confirm that Juror Eleven did not agree with the verdict. The record does not indicate that the trial court was attempting to elicit a different response from Juror Eleven. Similarly, while Appellant asserts that the trial court was "tacitly instructing" Juror Eleven to change his verdict when it told the jury to "continue to deliberate until *you* have a unanimous verdict," the context of the trial court's instruction indicates that the instruction was directed to the entire jury. *See Howard*, 941 S.W.2d at 124. The trial court stated, "Okay. Ask the Jury to return to the jury room, then, and continue to deliberate until you have a unanimous verdict." This instruction to return with a unanimous verdict

necessarily implies only that all twelve jurors must arrive at the same verdict. Further, this was essentially the same instruction included in the trial court's charge: "[y]our verdict must be by a unanimous vote of all members of the jury." The trial court referred to the twelve-person jury as "you" throughout its charge—the first paragraph of the trial court's charge states "You are instructed that the law applicable to this case is as follows." In proper context, it is clear that these instructions were meant for the entire jury and were not directed specifically at Juror Eleven.

It is the trial judge's duty to reject an insufficient, unresponsive, incomplete, or informal verdict, call the jury's attention to the problem, and have the problem corrected either with the jury's consent or by sending them out to reconsider the verdict. CRIM. PROC. art. 37.10(a) (West 2006); *Reese v. State*, 773 S.W.2d 314, 317 (Tex. Crim. App. 1989) ("A verdict must be certain, consistent, and definite. It may not be conditional, qualified, speculative, inconclusive, or ambiguous."). The trial court did not include additional language in its instruction to continue deliberations that could be seen as pressuring the jury. *See Muniz*, 573 S.W.2d at 793–94 (holding that the instruction "You are instructed to return to the jury room and continue your deliberations in this case, to see if you can arrive at an answer to Special Issue Number II, contained in the Charge on Punishment" was not coercive.). Accordingly, we cannot conclude that the trial court improperly commented on the weight of the evidence or coerced Juror Eleven when it confirmed that the verdict was not unanimous and instructed the jury to continue deliberating until they reached a unanimous verdict. We overrule Appellant's first and fifth issues.

*Unanimous Verdict*

In Appellant's second and third issues, he asserts that the combination of the trial court's polling procedure, jury coercion, and comment on the weight of the evidence resulted in a conviction by a nonunanimous jury. However, Appellant did not make a contemporaneous objection to the trial court's polling procedure or

comments, and we have determined that the trial court did not comment on the weight of the evidence and did not coerce Juror Eleven into reaching his verdict of guilty.

Appellant contends that the verdict could not have been unanimous based on information regarding Juror Eleven's deliberative process. Specifically, Appellant relies on an affidavit signed by Juror Eleven in preparation for Appellant's original motion-for-new-trial hearing and Juror Eleven's testimony at the second motion-for-new-trial hearing following our remand.[5] Juror Eleven's affidavit and his testimony contained information about how he arrived at his decision to convict Appellant.

Jurors are prohibited "from testifying about 'any matter or statement occurring during the jury's deliberations,' with two exceptions." *McQuarrie v. State*, 380 S.W.3d 145, 150 (Tex. Crim. App. 2012) (quoting TEX. R. EVID. 606(b)). A juror may testify about "whether any outside influence was improperly brought to bear upon any juror" or "to rebut a claim that the juror was not qualified to serve." *Id.* (quoting TEX. R. EVID. 606(b)). An outside influence is "something originating from a source outside of the jury room and other than from the jurors themselves." *Id.* at 154. Accordingly, the evidence that Appellant sought to offer from Juror Eleven about his deliberative process was precluded under Rule 606(b). Moreover, Juror Eleven did not contend that the trial court's questioning of him about his verdict coerced him into changing his verdict.

The evidence properly before us shows that the trial court instructed the jury to resume deliberations until they reached a unanimous verdict, and the jury returned with a unanimous guilty verdict. All twelve jurors were polled again, and each juror affirmed that the verdict was theirs—including Juror Eleven. Therefore, the record

---

[5]The trial court allowed Appellant to offer Juror Eleven's affidavit and Juror Eleven's testimony as a bill of exception at the second motion-for-new-trial hearing on remand.

before us shows that Appellant was convicted by a unanimous jury. We overrule Appellant's second and third issues.

*Denied Instructions in the Trial Court's Charge*

In Appellant's eighth and ninth issues, he contends the trial court erred in denying his requests to include two additional instructions in the trial court's guilt/innocence charge. A review of alleged jury-charge error involves a two-step analysis. *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005); *Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994). We must first determine whether the charge contained any actual error. *Ngo*, 175 S.W.3d at 743–44; *Abdnor*, 871 S.W.2d at 731–32. If there was actual error, we must next determine whether the error resulted in sufficient harm to require reversal. *Ngo*, 175 S.W.3d at 743–44; *Abdnor*, 871 S.W.2d at 731–32; *see also Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015) (describing *Almanza* harm analysis for jury charge error); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985).

The trial court is required to give the jury a written charge "setting forth the law applicable to the case." CRIM. PROC. art. 36.14 (West 2007); *Vega v. State*, 394 S.W.3d 514, 518 (Tex. Crim. App. 2013). A trial court is required to instruct a jury on any "statutory defenses, affirmative defenses, and justifications whenever they are raised by the evidence," regardless of whether the defensive evidence is "strong, weak, unimpeached, or contradicted." *Walters v. State*, 247 S.W.3d 204, 208–09 (Tex. Crim. App. 2007); *Booth v. State*, 679 S.W.2d 498, 500 (Tex. Crim. App. 1984); *see* PENAL § 2.03.

A defensive issue is raised by the evidence if there is some evidence, regardless of its source, on each element of a defense that, if believed by the jury, would support a rational inference that the element is true. *See Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007). When deciding whether a defensive issue has been raised by the evidence, a trial court must rely on its own judgment,

26

formed in light of its own common sense and experience, as to the limits of rational inference from the facts that have been proven. *Id.* at 658. Whether the record contains such evidence is a question of law, which means that we do not apply the usual rule of appellate deference to the trial court's ruling. *Id.* "Quite the reverse, we view the evidence in the light most favorable to the defendant's requested submission." *Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006).

*The "Right to Continue Shooting" Until the Danger Has Passed*

In his eighth issue, Appellant asserts that the trial court erred in denying his request to include an instruction about his "right to shoot and continue to shoot until the danger had passed." Appellant cites a case from 1909, *Duke v. State*, in support of this proposition. 133 S.W. 432, 434 (Tex. Crim. App. 1909) (holding that "the omission by the court to charge with reference to the right of appellant to continue to shoot was harmful under the facts in the record").

The "right" to "shoot and continue to shoot until the danger had passed" does not appear in the Penal Code. *See generally* PENAL, Chs. 8–9. A trial court should not instruct a jury on a defensive theory that is not explicitly recognized in the Penal Code. *Walters*, 247 S.W.3d at 209–10 (citing *Giesberg v. State*, 984 S.W.2d 245, 250 (Tex. Crim. App. 1998)). In *Giesberg*, the Court of Criminal Appeals held that, "because the authority to establish what constitutes a defense rests solely with the Legislature, . . . a defense which is not recognized by the Legislature as either a defense or as an affirmative defense does not warrant a separate instruction." 984 S.W.2d at 250 (citing *Sanders v. State*, 707 S.W.2d 78, 80–81 (Tex. Crim. App. 1986), *abrogated on other grounds by Willis v. State*, 790 S.W.2d 307, 314–15 (Tex. Crim. App. 1990)).

In *Walters*, the Court of Criminal Appeals clarified the scope of *Giesberg* by holding that "special, non-statutory instructions, *even when they relate to statutory offenses or defenses*, generally have no place in the jury charge." 247 S.W.3d at 211

27

(emphasis added). Therefore, a party will not be entitled to a special instruction that (1) is not grounded in the Penal Code; (2) is already covered by the general charge to the jury; and (3) "focuses the jury's attention on a specific type of evidence that may support an element of an offense or a defense," because the instruction would be an impermissible comment on the weight of the evidence. *Id.* at 212.

First, as we previously determined, a special instruction on Appellant's "right" to continue shooting until the danger had passed is not found in the Penal Code. We presume that the absence of that defense in the Penal Code is an intentional silence by the Legislature. *See id*.

Second, the defense-of-a-third-person instruction that the jury received was as follows:

> [A] person is justified in using force or deadly force against another to protect a third person if, under the circumstances as he reasonably believes them to be, such person would be justified in using force or deadly force to protect himself against the unlawful force or deadly force of another which he reasonably believes to be threatening the third person he seeks to protect, and *he reasonably believes that his intervention is immediately necessary to protect the third person*. (emphasis added).

The included language "immediately necessary to protect the third person" implies that, if the actor reasonably believes that he must intervene with deadly force, his intervention is permitted so long as the immediate danger to the third person persists. Thus, if the jury had found that Appellant's intervention and use of deadly force was immediately necessary to protect Bernie, the jury would have necessarily determined that Appellant only fired while Bernard was an imminent threat to Bernie. As such, the "right to shoot and keep shooting" until the danger has passed was already covered by the instruction for the defense of a third person.

Finally, an instruction about the "right to shoot and continue to shoot until the danger has passed" would have focused the jury's attention on a specific type of

28

evidence introduced to prove or disprove Appellant's defensive theory of defense of a third person, which would effectively and "improperly tell[] the jury how to consider certain evidence before it." *See id.* at 214. Therefore, the trial court did not err in excluding a proposed instruction that would have constituted an impermissible comment on the weight of the evidence. *See id.* at 212.

In summary, the "right to shoot and continue to shoot until the danger has passed" is not grounded in the Penal Code, was covered by the included defense of a third person instruction, and would constitute an impermissible comment on the weight of the evidence. *See id.* Accordingly, Appellant was not entitled to such an instruction in the trial court's charge. We overrule Appellant's eighth issue.

*The Right to Use Deadly Force to Defend Property at Night*

In Appellant's ninth issue, he contends that the trial court erred when it denied a proposed instruction on the "right" to use deadly force to protect property at night. Section 9.41 of the Penal Code states that a person in lawful possession of land or tangible, movable property is justified in using force against another, when and to the degree the person reasonably believes the force is immediately necessary, to prevent or terminate another's trespass onto or unlawful interference with the property. PENAL § 9.41 (West 2019). Section 9.42 of the Penal Code states that a person is justified in using deadly force against another to protect land or tangible, movable property: (1) if the person would be justified in using force against another under Section 9.41; (2) when and to the degree the person reasonably believes the deadly force is immediately necessary to prevent the other's imminent commission of arson, burglary, robbery, aggravated robbery, theft during the nighttime, or criminal mischief during the nighttime; and (3) the person reasonably believes that the land or property cannot be protected or recovered by any other means, or the use of force other than deadly force to protect or recover the land or property would

expose the actor or another to a substantial risk of death or serious bodily injury. PENAL § 9.42.

Appellant suggested at trial, and asserts on appeal, that he was justified in using deadly force in the nighttime to prevent Bernard from committing criminal mischief. A person commits the offense of criminal mischief if the person, without the effective consent of the owner, intentionally or knowingly damages or destroys the tangible property of the owner. PENAL § 28.03 (West Supp. 2022). Appellant's theory at trial and on appeal is that the jury would have been able to infer that Bernard was on a "destruction spree" and meant to throw the brick at the gate instead of Bernie, "nonetheless causing damage that constitutes criminal mischief [during the nighttime]."

A defendant will only be entitled to a defensive issue if there is some evidence of each element of a defense to support a rational inference that the element is true. *See Shaw,* 243 S.W.3d at 657–58. Section 9.41 only allows force to be used *when and to the degree* the actor reasonably believes the force is immediately necessary to prevent or terminate a trespass on the land or unlawful interference with the property. If Appellant shot the firearm—fourteen times—to prevent or terminate Bernard's trespass on the land or his unlawful interference with the property, Appellant used a disproportionate degree of force to effectuate the prevention or termination of the trespass, which precludes a justification defense under Section 9.41 and, as a result, a defense under Section 9.42. *See* PENAL §§ 9.41(a), 9.42(1). Moreover, Section 9.42 requires the actor to have a reasonable belief that criminal mischief is *imminent*. But here, there is no evidence in the record showing that Bernard was still a threat to Appellant's property at the time Appellant began shooting at Bernard. There was no indication that Bernard was attempting to retrieve the brick he threw or attempting to otherwise damage the Gonzalez property. While the intended target of the brick Bernard threw is unknown, the Gonzalez family

30

testified that Bernard approached Bernie after throwing the brick and that the two were engaged in a physical fight when Appellant arrived at the scene with his firearm. That is, even if Bernard had intended to throw the brick at the property gate rather than Bernie, the testimony indicated that the threat of damage to Appellant's property had passed after the brick was thrown.

Accordingly, we conclude that the trial court did not err by denying Appellant's requested instruction because Appellant used a disproportionate degree of force, and there is no evidence in the record to support a reasonable belief that Appellant's use of deadly force was immediately necessary to protect the property from imminent criminal mischief. *See* PENAL §§ 9.41–9.42; *see Leach v. State*, 983 S.W.2d 45, 47–48 (Tex. App.—Tyler 1998, no pet.); *Hernandez v. State*, 914 S.W.2d 218, 224 (Tex. App.—El Paso 1996, pet. ref'd); *see generally Hudson v. State*, 145 S.W.3d 323, 325 (Tex. App.—Fort Worth 2004, pet. ref'd) (holding that appellant was not entitled to defense-of-property instruction concerning a trespasser when there was no evidence that the trespasser threatened to remain on appellant's property or damage it); *Sparks v. State*, 177 S.W.3d 127, 132–33 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (holding that, although the victim had previously stabbed appellant when he refused to give her money, appellant was not entitled to a Section 9.42 instruction concerning the victim because the victim was defending appellant from a third person "and not attacking or robbing [appellant] *when appellant acted* to defend his property.") (emphasis added). We overrule Appellant's ninth issue.

### *Denial of Testimony from Defense Witness*

Appellant's tenth through twelfth issues relate to the trial court's decision to not allow Aaron Clements, Appellant's proposed expert witness, to testify at trial. On June 3, 2019, Appellant's trial counsel informed the trial court that his law firm partner had filmed an out-of-court test firing with a firearm purportedly similar to

31

the one Appellant used, and that the results of that test firing indicated that shell casings "can go five feet, they can go 25 feet, and that you really can't make any conclusion based on the pattern that these shell casings exist [sic] in this case." Appellant's trial counsel asserted that he wanted his partner to testify in a fact witness capacity regarding the experiment, and that he would offer Aaron Clements as a firearms expert if the trial court found that an expert was needed. The State objected to defense counsel's untimely notice of expert designation under Article 39.14 of the Code of Criminal Procedure. *See* CRIM. PROC. art. 39.14(b) (West Supp. 2022) (Upon timely request, a party must disclose the name and address of each person a party may use at trial to present evidence as an expert no later than twenty days before trial.). The trial court ruled that "[a]t the proper time before anything is proffered the Court is going to grant a Motion in Limine as to those matters, and we'll take it up outside the presence of the jury."

On June 7, 2019, the morning of voir dire, the trial court conducted a hearing on a motion for an independent examination of evidence that Appellant's trial counsel had filed. Appellant's trial counsel informed the trial court that:

> [U]ntil this week, I thought there was no dispute about the ejection of the shell casings from the right side of this weapon that is -- the weapon in question. It is an AK-47 knockoff or look alike -- a Romania or something like that. And it -- we -- the pattern of the shell casings that are demonstrated by the police investigation[6] seems to say or seems to appear that shell casings will be ejected in a consistent pattern rather than randomly. We have initially tested a similar weapon and had been able to determine they discharge those casings from 5 feet to 27 feet. And it doesn't matter whether it is the first, second, third or fourth. You never know how far that shell casing is going to go.
>
> And so I thought that we were in agreement about that, but there has been discussions that led me to believe that the State may dispute

---

[6] Officer Bradley had prepared a diagram of the scene and marked the approximate locations of the shell casings that were recovered.

that. And so we wanted to take an hour this weekend to have our expert, Aaron Clements, demonstrate firing of, you know, possibly one magazine of 33 rounds of -- to show that the pattern is not a consistent pattern.

The State objected to the motion for an independent examination of evidence and again asserted that defense counsel's designation of Clements as an expert was untimely. The State also asserted that Clements, the county attorney for Dickens County, was not a ballistics expert and that a hearing on whether Clements was qualified to testify as a ballistics expert had not been conducted.[7]

The trial court instructed the parties that it would allow the independent examination of the evidence "with the qualification that we will have a hearing outside the presence of the jury for me to determine whether or not [Clements] is or is not an expert. And I will also deal with the timeliness at the time that we have that hearing." Counsel agreed to conduct the independent examination that weekend in the presence of the State's expert and "members of the DA's office."

The independent examination was conducted on June 9, 2019. Appellant's trial counsel, Robert Barrera, recounted the independent examination in the affidavit he prepared for the hearing on Appellant's motion for new trial. Barrera's affidavit stated that:

> The testing was videotaped and photographed and the location of each of the casings ejected from the rifle was marked and measured in relation to both the direction of the barrel and the distance from the shooter. The test results revealed that approximately 80% of the shell casings ejected both to the right of the rifle and forward of the shooter at approximately a forty-five-degree angle. The casings landed from 6 to 21 feet from the rifle. Several of the ejected shell casings went to the right and rear of the shooter.

---

[7]The State also objected to unsealing the firearm and "put[ting] the evidence in a different state [than] it was in the last time [the State's] experts saw it."

When Appellant's trial counsel sought to offer Clements's testimony at trial, the trial court held a hearing outside the presence of the jury to determine whether Clements was qualified to testify as an expert. Clements testified that he had a bachelor's degree in chemistry and a background in physics; he was licensed in the State of Texas to carry a handgun; he was a federally licensed gun dealer; and that he was a "special occupational tax payer under the National Firearms Act, authorized to deal in National Firearms Act weapons." Clements testified that he had fired "fully automatic weapons" before and possessed four automatic weapons in his dealer inventory at the time of trial. Clements testified that he was familiar with how automatic firearms operate, including AK-47 firearms, and that he had at least thirty years' experience firing shoulder-fired semi-automatic weapons.

Clements also testified that most semi-automatic weapons eject shell casings to the right, and that most shell casings are generally found to the right side of the person firing the weapon. Clements stated that many factors, such as the condition of the weapon's ejector, whether the weapon is hot or dirty, and environmental factors can affect where a shell casing will land.

Clements explained that he test-fired the firearm Appellant used to "demonstrate the ejection pattern of casings from the weapon." Clements testified that, based on the results of his test-firing, he would place Appellant "in an area roughly where the intersection of the circle drive with the main driveway would be." Clements acknowledged that he had never been to the scene, had seen "very few" photographs of the scene, and that his opinion was based off Officer Bradley's diagram.

On cross-examination, Clements confirmed that he had never testified in an expert capacity "regarding ballistics or anything to do with shooting firearms or ejection patterns" and that he had never been qualified as an expert to testify as to those matters. Clements also confirmed that he had never been to any law

34

enforcement training regarding the shooting of semi-automatic rifles, nor had he been to any training for crime scene reconstruction. Clements clarified that his opinion was not offered to show exactly where Appellant was when he was firing, but to show the general area the weapon would have had to be in order to create the ejection pattern recorded by Officer Bradley. Clements acknowledged that he was not asked to replicate conditions such as weather and ground conditions that were present on the night of the incident.

The trial court ultimately held that it was not going to admit Clements's testimony, stating that Clements did not have the experience "that rises to the level of being a qualified expert under the law." The trial court also found that Clements was not timely designated an expert.

The trial court allowed Appellant's trial counsel to make a bill of exception in response to the trial court's ruling. Appellant's trial counsel explained that the defense intended to call Clements to rebut testimony that Appellant was in the middle of the road when the shots were fired. Appellant's trial counsel asserted that Clements was qualified to testify as an expert based on his experience and knowledge of firearms, and that Clements could testify as a fact witness regarding "the pattern of shells that were ejected from this firearm under controlled conditions." The trial court clarified that it was not allowing Clements to testify as either an expert or fact witness. Appellant's trial counsel objected to the exclusion of Clements's testimony and argued that it violated Appellant's rights to due process, a fair trial, and effective assistance of counsel. The trial court overruled trial counsel's objections but granted a running objection.

On appeal, Appellant contends that the trial court's exclusion of Clements's testimony violated Appellant's right to a fair trial (eleventh issue), right to present a defense (tenth issue), and right to confrontation (twelfth issue). Generally, the right to present evidence and to cross-examine witnesses under the Sixth Amendment

35

does not conflict with the corresponding rights under state evidentiary rules. *Hammer v. State*, 296 S.W.3d 555, 561 (Tex. Crim. App. 2009); *see Miller v. State*, 36 S.W.3d 503, 507 (Tex. Crim. App. 2001) ("A defendant has a fundamental right to present evidence of a defense as long as the evidence is relevant and is not excluded by an established evidentiary rule."). As noted by the Court of Criminal Appeals in *Hammer*, there are two scenarios in which rulings excluding a defendant's evidence might rise to the level of a constitutional violation: (1) a state evidentiary rule that categorically and arbitrarily prohibits the defendant from offering otherwise relevant, reliable evidence that is vital to his defense and (2) a trial court's clearly erroneous ruling excluding otherwise relevant, reliable evidence that "forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense." *Id*. at 561 n.8 (quoting *Potier v. State*, 68 S.W.3d 657, 663–65 (Tex. Crim. App. 2002)). Appellant's tenth, eleventh, and twelfth issues constitute challenges under the "second category" because he asserts that the trial court made erroneous rulings under the rules of evidence that precluded him from effectively presenting his defensive theory. *See id*.

*Expert Testimony*

In his eleventh issue, Appellant contends that he was denied the right to a fair trial by the exclusion of Clements's expert testimony. The trial court's ruling on the admissibility of expert testimony is reviewed for an abuse of discretion. *Russeau v. State*, 291 S.W.3d 426, 438 (Tex. Crim. App. 2009). The admissibility of expert testimony is governed by Rule 702 of the Texas Rules of Evidence, which provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702.

36

"Just as the subject matter of an expert's testimony should be tailored to the facts of a case, the expert's background must be tailored to the specific area of expertise in which the expert desires to testify." *Vela v. State*, 209 S.W.3d 128, 133 (Tex. Crim. App. 2006). The Court of Criminal Appeals explained in *Rhomer v. State* that:

> The specialized knowledge that qualifies a witness to offer an expert opinion may be derived from specialized education, practical experience, a study of technical works or a combination of these things. A witness must first have a sufficient background in a particular field, but a trial judge must then determine whether that background goes to the very matter on which [the witness] is to give an opinion. "Fit" is a component of qualification, and the expert's background must be tailored to the specific area of expertise in which the expert desires to testify. The party offering expert testimony has the burden to show the witness is qualified on the matter in question.

*Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019) (internal citations and quotations omitted).

Appellant asserts that Clements was qualified to testify as "an expert on the ejection pattern of [Appellant's] rifle and the factors that can influence the discharge pattern." But Appellant sought to offer Clements to testify not only about his knowledge of firearms, but also to conduct a test firing of Appellant's weapon, document where shell casings landed, and to extrapolate the results of the test firing onto a diagram depicting the scene. Thus, the crux of Clements's offered testimony was that, based on the location of the shell casings recovered from the scene, Appellant was standing on his property when firing the AK-47.

The trial court did not abuse its discretion to act as gatekeeper when it determined that, while Clements likely has more knowledge and experience than the average layperson in shooting firearms, he was not qualified to give his opinion as to Appellant's location while firing the AK-47 based off the location of shell casings recovered from the scene. *See Rhomer*, 569 S.W.3d at 670 ("The trial court is

supposed to act as a gatekeeper against expert testimony that would not help the trier of fact."). Clements's knowledge and experience did not "fit" with his proposed testimony—abstract knowledge of how semi-automatic weapons perform does not aid the jury in analyzing the location of shell casings to determine where Appellant was standing when firing at Bernard. *See id.* at 669; *Broders v. Heise*, 924 S.W.2d 148, 153 (Tex. 1996) (holding that, while a medical doctor "possessed knowledge and skill not possessed by people generally," that knowledge "does not in and of itself mean that such expertise will assist the trier of fact regarding the issue before the court").

Appellant's location when firing would have been more appropriately determined by a crime scene investigator or ballistics expert. *See, e.g.*, *Beathard v. State*, 767 S.W.2d 423, 426 (Tex. Crim. App. 1989) (crime scene investigators testified that they used the location of shell casings and the projected trajectory of shots to determine the shooter's location); *Feaster v. State*, No. 05-18-00739-CR, 2019 WL 2282295, at *4 (Tex. App.—Dallas May 29, 2019, pet. ref'd) (mem. op., not designated for publication) (Detective who processed the crime scene testified that "the location of shell casings and projectiles indicated that guns were fired towards each other, which . . . is logically consistent in a scenario in which an armed victim is warding off an armed assailant.").

On cross-examination, Clements confirmed that he had never been qualified as an expert in ballistics, had never been to any law enforcement training regarding firearms, and had never been to any training for crime scene reconstruction. Further, while Clements testified about how he conducted the test firing, he did not testify about his methodology in using that test firing to determine Appellant's location at the scene. In light of the wide discretion we give the trial court regarding the admissibility of expert testimony, we cannot say that the trial court abused its discretion in determining that Clements was not qualified to testify in an expert

capacity about Appellant's location. *See Rhomer*, 569 S.W.3d at 669 (citing *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)). We overrule Appellant's eleventh issue.[8]

*The Right to Present a Defense*

In Appellant's tenth issue, he asserts that he was prevented from presenting his defense "that the pattern of casings ejected from the weapon . . . indicate[s] that all shots were fired forward and in defense of another." We have already determined that Clements was not qualified to testify as an expert and that his testimony that Appellant was shooting from his property was properly excluded. However, Appellant's trial counsel also asserted that Clements could testify as a fact witness about "the pattern of shells that were ejected from this firearm under controlled conditions." On appeal, Appellant contends Clements's testimony as a fact witness on what he observed made a fact of consequence more or less probable. *See* TEX. R. EVID. 401 (Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence, and the fact is of consequence in determining the action.).

We review a trial court's decision to admit or exclude an out-of-court experiment for an abuse of discretion. *Ginther v. State*, 672 S.W.2d 475, 477 (Tex. Crim. App. 1984). An out-of-court experiment is generally admissible so long as the experiment was made under similar conditions to the event in which the experiment relates. *Esquivel v. State*, 595 S.W.2d 516, 529 (Tex. Crim. App. 1980). A trial court will abuse its discretion if it excludes an experiment that was affirmatively shown to be conducted under similar circumstances. *Ginther*, 672 S.W.2d at 477 (citing *Hodge v. State*, 131 S.W. 577 (Tex. Crim App. 1910)).

---

[8]Appellant also asserts that the trial court prevented Appellant from presenting a defense when it excluded Clements's expert testimony based on Appellant's failure to timely designate him as a witness. *See* CRIM. PROC. art. 39.14(b). Because we have determined that the trial court properly determined that Clements was not qualified to testify as an expert, we do not address this contention.

However, a trial court will not abuse its discretion in excluding an experiment that is substantially *dissimilar* to the actual event. *Id.* (citing *Herrin v. State*, 525 S.W.2d 27 (Tex. Crim. App. 1975)); *see Esquivel*, 595 S.W.2d at 529.

The trial court did not abuse its discretion in excluding Clements's testimony about the ejection pattern of shell casings under controlled conditions because the experiment was so dissimilar to the actual conditions that it would not have aided the jury. *See Ginther*, 672 S.W.2d at 477; *Montgomery*, 810 S.W.2d at 380. Four years had passed between the incident and Clements's test firing. Clements did not conduct the test firing at the Gonzalez residence, and he testified that he had never been to the scene of the incident. Clements testified that he was not asked to replicate conditions such as weather and ground conditions that were present on the night of the incident. While eyewitness testimony indicated that Appellant was moving while shooting, Clements stood in a fixed position and did not move during the test firing. There is no evidence in the record regarding Clements's height versus Appellant's height or Clements's ability to control the firearm versus Appellant's ability to control the firearm.

Thus, there are numerous important differences between Appellant's shooting of the firearm on the night of the murder and Clements's test firing four years later. Clements's test firing is substantially dissimilar from the actual event; therefore, the trial court did not abuse its discretion in excluding Clements's testimony about his test firing under controlled conditions. *See Ginther*, 672 S.W.2d at 477 (citing *Herrin*, 525 S.W.2d 27).

Finally, we briefly note that Appellant's defensive theory that he remained on his property was not wholly excluded by the trial court's decision to exclude Clements's testimony. Gregorio testified that Appellant was inside the property line when he was shooting and did not walk onto the road. Appellant's trial counsel was able to fully develop Gregorio's testimony, an eyewitness, on this issue during trial.

40

The jury was free to accept or reject Gregorio's testimony. *See Braughton*, 569 S.W.3d at 611. We overrule Appellant's tenth issue.

*Confrontation Clause*

In Appellant's twelfth issue, he asserts that the trial court's decision to exclude Clements's testimony "denied his right to confrontation" under the Sixth Amendment because he was unable to "confront the witnesses against him by the production and presentation of favorable evidence in defense of the [S]tate's case." Appellant has conflated the right to present witnesses in his defense with the right to confront the State's witnesses and challenge the witnesses' testimony through cross-examination. *See Washington v. Texas*, 388 U.S. 14, 19 (1967) ("Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense.").

"The Confrontation Clause 'provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination.'" *London v. State*, 526 S.W.3d 596, 600 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987)); *see* U.S. CONST. amend. VI. Here, Appellant is not asserting that he was deprived of the right to physically face the witnesses who testified against him; nor does he assert that he was not allowed to cross-examine witnesses. Rather, Appellant is contending that the exclusion of Clements's testimony deprived Appellant of the chance to offer favorable evidence that rebutted the State's theory that Appellant "was in the middle of the street firing downward" at Bernard. This argument pertains to Appellant's right to present evidence in his defense—not Appellant's right to confront the witnesses who testified against him. *See Washington*, 388 U.S. at 19. Therefore, Appellant has not presented a Confrontation-Clause claim for our review. We overrule Appellant's twelfth issue.

41

*Allegation that the State Withheld Material Exculpatory Evidence*

In his thirteenth and fourteenth issues, Appellant contends that the State withheld material impeachment evidence about Mistry Canady, the wife of the decedent. We note at the outset that, "[o]rdinarily, a conviction is not overturned unless the trial court makes a mistake." *Johnson v. State*, 169 S.W.3d 223, 228–29 (Tex. Crim. App. 2005). Thus, most appellate issues are directed at the conduct of the trial court rather than opposing counsel. In some limited situations, misconduct by the prosecutor can be grounds for reversing a conviction even though the trial court has done nothing wrong. *Id.* at 229 (listing the suppression of exculpatory evidence by the prosecution as an example).

Appellant asserts that he needed the opportunity to impeach Mistry at trial because she minimized Bernard's "anger and actions once he found out about the wrecked car" and his "propensity for violence and an ungovernable temper." Therefore, Appellant contends, the State's alleged act of withholding impeachment evidence regarding Mistry violated his Fifth and Fourteenth Amendment due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963) and Article 39.14 of the Texas Code of Criminal Procedure.

In *Brady v. Maryland*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87; *see also Ex parte Lalonde*, 570 S.W.3d 716, 724 (Tex. Crim. App. 2019). Thus, *Brady* is violated when three requirements are satisfied: (1) the State suppressed evidence; (2) the suppressed evidence is favorable to the defendant; and (3) the suppressed evidence is material. *Lalonde*, 570 S.W.3d at 724.

Article 39.14 of the Texas Code of Criminal Procedure imposes broader discovery protections for criminal defendants, "making disclosure the rule and non-

disclosure the exception." *See Watkins v. State*, 619 S.W.3d 265, 277 (Tex. Crim. App. 2021); *see also* CRIM PROC. art. 39.14. As the Court of Criminal Appeals explained in *Watkins*, Article 39.14(h) creates "an independent and continuing duty for prosecutors to disclose evidence that may be favorable to the defense even if that evidence is not 'material.'" *Watkins*, 619 S.W.3d at 277.

The relevant evidence was discussed at the first hearing on Appellant's first motion for new trial. Appellant's trial counsel testified that he first learned Mistry was a target of a federal fraud conspiracy investigation during the jury's punishment deliberations. Appellant's trial counsel testified that, had he known about Mistry's involvement during trial, he would have questioned her about it; Appellant's trial counsel viewed Mistry's involvement as "an additional reason to be biased or have animus" against Appellant "because of [her] need to curry favor to [sic] the federal prosecutors."

When Appellant's counsel on appeal questioned Mistry at the hearing on the motion for new trial about her contacts with the FBI, Mistry revealed that the FBI had contacted her in October 2018, eight months before trial. Because Appellant's trial counsel testified that he was never informed of this contact, his appellate counsel sought to determine whether the State was aware of the October 2018 contact at the time of the trial.

Appellant contends the motion-for-new-trial record makes it clear that Mistry had informed the State about the October 2018 contact before trial. In contrast, the State contends that the record shows Mistry informed defense counsel about the October 2018 contact before trial. However, after reviewing the record, we find that neither interpretation is supported.

Notably, the record demonstrates initial confusion in Mistry's answers to questions about whether she informed the State and/or defense counsel about the October 2018 contact. However, appellate counsel clarified the record as follows:

Q: Okay. So, let me make this really clear. You called the State District Attorney's Office and told them the FBI wanted to talk to you; is that right?

A: Not the FBI.

Q: I'm sorry.

A: Hurley's office.

Q: I'm sorry?

A: Somebody from Hurley, with Hurley.

Q: Okay. Did you ever tell the State that the federal agents wanted to talk to you in the other investigation?

A: No ma'am. I didn't know I needed to.

Q: Okay. And, so, you did not call the D.A.'s Office to tell them --

A. No.

Q. -- about the federal investigation?

A. No. Well, I -- no, ma'am, I didn't know I needed to.

Q: Okay. And you never told anyone in the courtroom before you testified or afterwards that you were under investigation?

A. I didn't know I was under investigation. A company I worked for was under investigation. But, no, ma'am, I didn't know I needed to.

Q. Okay. And did you tell anyone from the State that they wanted -- that is the federal authorities, wanted to interview you about that matter?

A. No, ma'am.

Upon a full review of the pertinent testimony, Mistry testified that she did not inform the State or defense counsel that the FBI had contacted her prior to trial. Rather, Mistry testified that she informed the District Attorney's Office that an employee of Dan Hurley, Appellant's trial counsel, had attempted to contact her. Therefore, the State did not violate Article 39.14 or Appellant's due process rights by failing to

disclose information that Mistry had never provided the State with in the first place.[9] *See* CRIM. PROC. art. 39.14(h) ("[T]he State shall disclose to the defendant any exculpatory, impeachment, or mitigating . . . information *in the possession, custody, or control of the state* that tends to negate the guilt of the defendant or would tend to reduce the punishment for the offense charged.") (emphasis added); *Pena v. State*, 353 S.W.3d 797, 810 (Tex. Crim. App. 2011) ("*Brady* and its progeny do not require prosecuting authorities to disclose exculpatory information to defendants that the State does not have in its possession and that is not known to exist.") (quoting *Hafdahl v. State*, 805 S.W. 2d 396, 399 n.3 (Tex. Crim. App. 1990)); *see also Wells v. State*, No. 05-21-00855-CR, 2023 WL 5424313, at *12 (Tex. App.—Dallas Aug. 23, 2023, no pet. h.) ("*Brady* does not require the State to disclose exculpatory information that it does not know exists. Nor does the State have any duty to seek out such information independently on the defendant's behalf.") (citations omitted). We overrule Appellant's thirteenth and fourteenth issues.

## *Denial of Motion for New Trial*[10]

In Appellant's eighteenth issue, he contends that the trial court erred in denying his motion for new trial because (1) the State withheld material exculpatory impeachment information about Mistry from Appellant; (2) evidence was introduced at the hearing showing that the shots Appellant fired were "low and ricocheted off the road," indicating that Appellant did not intend to kill Bernard[11]; (3) Clements was qualified to be an expert and testify at trial; (4) Juror Eleven's affidavit showed

---

[9]We also note that the District Attorney confirmed during the hearing that the District Attorney's office had no knowledge that Mistry was the target of a federal investigation before trial. Therefore, the State never possessed the information of which Appellant complains.

[10]As we previously noted, Appellant's fifteenth, sixteenth, and seventeenth issues concern the manner in which the trial court conducted the initial hearing on Appellant's motion for new trial. We sustained those issues upon initial submission by abating the proceeding for a new evidentiary hearing on the motion for new trial.

[11]Appellant did not contest the element of intent at trial.

45

that Appellant was convicted by a nonunanimous jury; and (5) Juror Five did not inform trial counsel during voir dire that he worked at Spike Dykes Ford with Mistry.

"We review a trial court's denial of a motion for new trial under an abuse of discretion standard." *McQuarrie*, 380 S.W.3d at 150. We do not substitute our judgment for the trial court's judgment but, instead, determine whether the trial court's decision was arbitrary or unreasonable. *Colyer v. State*, 428 S.W.3d 117, 122 (Tex. Crim. App. 2014). "We view the evidence in the light most favorable to the trial judge's ruling and presume that all reasonable factual findings that could have been made against the losing party were made against that losing party." *Id.* When denying a motion for a new trial, a trial court abuses its discretion only if no reasonable view of the record could support the ruling. *Id.*

We have already determined that the State did not withhold material exculpatory impeachment information about Mistry; that the trial court did not abuse its direction by determining that Clements was not qualified to testify in either an expert or a lay witness capacity; and that Appellant was convicted by a unanimous jury. We now turn to Appellant's remaining assertions—that his motion for new trial should have been granted because (1) evidence introduced during the hearing showed that the shots Appellant fired were low and ricocheted off the road; and (2) Appellant would have stricken Juror Five from the jury panel if the juror had disclosed that he worked at Spike Dykes Ford.

Appellant attempted to introduce ballistics evidence at the motion-for-new-trial hearing through an affidavit prepared by Texas Burrell. Burrell's affidavit stated that he was a Coast Guard Gunners Mate, a federal law enforcement officer, and a law enforcement shooting instructor, and that he had completed training courses about firearms. In his affidavit, Burrell stated that his "observation of the photos of bullet and bullet fragments collected is that they are more consistent with a bullet that has impacted or passed through a hard medium"; in support, the affidavit

included reproduced photographs depicting a jacket that "sustained excessive damage," a lead core separated from a bullet's copper jacket that was "abnormally deformed," and "an oblong entrance hole" on Bernard's body.  Burrell also stated in his affidavit that the location of the spent shells were consistent with Appellant "having fired from within his own property and convince[d] [him] that he did not enter the public roadway."

However, Appellant did not offer Burrell as an expert to testify during trial. The trial court ruled that it was not going to allow testimony from a person who did not testify at trial to be presented at the initial hearing on the motion for new trial and held that Burrell's testimony and affidavit were not relevant to the motion for new trial.  The trial court allowed Appellant to submit Burrell's affidavit as part of trial counsel's "bill of exception."

"Trial courts do not have the discretion to grant a new trial unless the defendant demonstrates that his or her first trial was seriously flawed and that the flaws adversely affected the defendant's substantial rights to a fair trial."  D. Mark Elliston & Terrence W. Kirk, 3 *Texas Practice: Criminal Practice and Procedure* § 27:6 (2023) (Motion for New Trial—Rule does not provide exclusive grounds). Appellant did not specify the grounds on which he was attempting to introduce Burrell's expert testimony at the hearing on the motion for new trial, and he does not elaborate on either in his brief.

Nevertheless, we note that a defendant who files a motion for new trial based on newly discovered evidence must show that (1) the newly discovered evidence was unknown or unavailable to the defendant at the time of trial; (2) the defendant's failure to discover or obtain the new evidence was not due to the defendant's lack of due diligence; (3) the new evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching; and (4) the new evidence is probably true and will probably bring about a different result in a new trial.  *State v. Arizmendi*,

519 S.W.3d 143, 149 (Tex. Crim. App. 2017); *see* CRIM. PROC. art. 40.001 (West 2018). Where a defendant has not satisfied all four prongs of the test, a trial court does not abuse its discretion in denying a motion for new trial. *See Arizmendi*, 519 S.W.3d at 148–49.

There is nothing in the record that indicates that Appellant was unaware of the potential ricochet patterns of the bullets or their fragments; nor was there anything in the record indicating that Burrell was unable to testify at trial. Officer Bradley testified that some of the bullets recovered from the scene could have been damaged by ricocheting off pavement. Therefore, the jury was presented with some evidence that Appellant could have fired some of the shots from an angle that would have caused the bullets to ricochet off pavement. Thus, the jury's guilty verdict indicates a rejection of the theory that bullets or fragments that possibly ricocheted off pavement established a lack of intent.[12] Accordingly, additional evidence would have been cumulative and unlikely to change the outcome of the trial. The trial court did not abuse its discretion in excluding Burrell's affidavit and testimony.

Appellant also asserts that Juror Five testified in the second hearing on the motion for new trial that "he knew Mistry Canady long before the trial in this cause and that information was never relayed to defense counsel." Juror Five worked at Spike Dykes Ford at the same time as Mistry. Appellant's trial counsel stated during the hearing that, had he known that information, he would have moved to strike Juror Five from the panel due to the possibility that Juror Five would be biased in favor of

---

[12]To the extent Burrell's affidavit or testimony was purporting to support any theory that Appellant did not cause Bernard's death by shooting Bernard with the firearm, but instead that Bernard's death was caused by a fatal bullet or bullet fragment ricocheting off pavement, we note that Appellant's trial counsel stipulated that the cause of death "was due to gunshot wounds by a gun fired by [Appellant]" and that "[t]here's no contested issue about that." Further, Dr. Parsons testified that, while two of the gunshot wounds to Bernard's knee and lower left leg had irregular or "less regular" entry points, the fatal gunshot wound and the remaining gunshot wound showed "no evidence of a ricochet."

Mistry. On appeal, Appellant contends that he was harmed by Juror Five's failure to disclose that he was employed by Spike Dykes Ford at the same time as Mistry.[13]

"The voir dire process is designed to insure, to the fullest extent possible, that an intelligent, alert, disinterested, impartial, and truthful jury will perform the duty assigned to it." *Armstrong v. State*, 897 S.W.2d 361, 363 (Tex. Crim. App. 1995) (per curiam); *see Barnett v. State*, 420 S.W.3d 188, 191–92 (Tex. App.—Amarillo 2013, no pet.). When a juror withholds material information in the voir dire process, the parties are denied the opportunity to intelligently exercise their challenges and obtain a disinterested and impartial jury. *Armstrong*, 897 S.W.2d at 363. To be material, the information withheld must be of a type suggesting potential for bias or prejudice. *Barnett*, 420 S.W.3d at 192. It is incumbent upon defense counsel to ask questions calculated to elicit information that might indicate a juror's inability to be impartial and truthful. *Armstrong*, 897 S.W.2d at 363–64. Unless defense counsel asks such questions, the material information that the juror fails to disclose is not "withheld." *Id.* at 364.

During voir dire, the District Attorney questioned the jury panel about whether they knew "Bernard Canady." Several potential jurors responded in the affirmative and in doing so, some indicated that they knew Mistry either personally or through work, including three who stated they knew Mistry because they worked with her at Spike Dykes. Juror Five did not advise the attorneys or the trial court that he knew Mistry or that he worked with her at Spike Dykes Ford.

Appellant's counsel on appeal submitted a declaration prepared by Bernie in support of Appellant's motion for new trial. In his declaration, Bernie stated that both Juror Five and Mistry were employed at Spike Dykes Ford with Bernie and that

---

[13]Appellant also briefly contends the harm Appellant suffered by the inclusion of a biased juror on the panel was compounded by another juror's "[taking] over the panel and [using] his position to force other jurors to capitulate to his position and render a verdict of guilty." We note that nothing in the record properly before us indicates that any juror was pressured into their verdict. *See* TEX. R. EVID. 606(b)(1).

49

a salesman had told Bernie that Mistry would talk to people at work about Bernard's death—including Juror Five.

At the initial hearing on the motion for rehearing, Juror Five testified that he worked at Spike Dykes Ford at the same time that Mistry worked there, but that he "never knew her" and he "had no knowledge of her husband dying before the trial." At the remanded motion-for-new-trial hearing, Juror Five testified that the questioning at voir dire concerned "just Bernard's name," that he only knew Mistry worked at Spike Dykes Ford, and he did not "know Mistry good enough to know that Bernard was her husband or anything of that sort." Juror Five further testified that he felt that he was qualified to serve on the jury because his knowledge that Mistry worked at Spike Dykes Ford "wasn't going to affect anything as far as [his] judgment." Juror Five confirmed that he worked in a different department than Mistry, did not spend any time with Mistry, had no "real interaction" with Mistry, and did not discuss any details of Bernard's death with her. Juror Five also stated that his verdict was not influenced by working at the same place as Mistry.

The trial court entered findings of fact and conclusions of law after the remanded-motion-for-new-trial hearing. The trial court found that "no bias on the part of [Juror Five] existed to the effect that he could not have been an impartial juror and that [Juror Five] had no duty to volunteer information to defense counsel during voir dire that disclosed his knowledge of Mrs. Canady's existence, at all or at Spike Dykes Ford."

We defer to the trial court's credibility determinations regarding Bernie's affidavit and Juror Five's testimony. *See Rhodes v. State*, 308 S.W.3d 6, 13 (Tex. App.—Eastland 2009, pet. ref'd, untimely filed) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). Based on the trial court's findings of fact and conclusions of law, in addition to the fact that Appellant's trial counsel chose not to elaborate on the District Attorney's questions about whether jurors personally

knew Mistry, we cannot say that the trial court abused its discretion in denying Appellant's motion for new trial. *See Colyer*, 428 S.W.3d at 122; *Armstrong*, 897 S.W.2d at 363–64. We overrule Appellant's eighteenth issue.

*Limiting Examination of Investigator*

In his nineteenth through twenty-first issues, Appellant contends that the trial court impermissibly limited his trial counsel's examination of Investigator Darrel Williams and violated his right to a fair trial. Specifically, Appellant's trial counsel sought to question Williams about an internal affairs investigation that Williams was the subject of and a former job application Williams had completed. The trial court denied both requests.

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016) (citing *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011)). "A trial judge abuses his discretion when his decision falls outside the zone of reasonable disagreement." *Id.* (citing *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010)).

The Sixth Amendment right to cross-examine a witness allows a party to attack the general credibility of that witness or to show their possible bias, self-interest, or motives in testifying. *Hammer*, 296 S.W.3d at 561. A defendant may elicit, on cross-examination, facts intended to show a witness's bias. Tex. R. Evid. 613(b); *Carroll v. State*, 916 S.W.2d 494, 500 (Tex. Crim. App. 1996). Parties are allowed great latitude to show any relevant fact that would establish or might tend to establish ill feeling, bias, motive, or animus on the part of the witness. *Carpenter v. State*, 979 S.W.2d 633, 634 (Tex. Crim. App. 1998); *London v. State*, 739 S.W.2d 842, 846 (Tex. Crim. App. 1987).

Despite this latitude, "[t]he defendant is not entitled to 'cross-examination that is effective in whatever way, and to whatever extent,' he might wish." *Johnson*, 490

S.W.3d at 909–10 (quoting *Johnson v. State*, 433 S.W.3d 546, 552 (Tex. Crim. App. 2014)). A trial judge retains the discretion to impose reasonable limits on such cross-examination to avoid harassment, prejudice, confusion of the issues, endangering the witness, marginally relevant evidence, or when the subject of the examination has been exhausted. *Irby v. State*, 327 S.W.3d 138, 145 (Tex. Crim. App. 2010) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)).

Appellant's trial counsel called Williams to testify about the investigation he conducted regarding the shooting. Appellant's appellate counsel states that the defensive theory was that the investigation was incomplete and "entirely focused on charging [Appellant] with murder." For this issue, Appellant states that in presenting Williams at trial, Appellant sought to establish that Williams was "biased in favor" of Bernard's family and that he "lacked veracity," because "[s]uch an investigation denies due process." Appellant's trial counsel sought to impeach Williams's veracity by offering an internal investigation file and an employment application. The trial court conducted an in-camera inspection of the file and informed trial counsel that he was denying Appellant's request to impeach Williams with the file because "there's nothing in there that relates to any type of misleading reports . . . being altered or anything of that nature. So . . . there's nothing having to do with his truth and veracity." The trial court allowed the file to be sealed and made a part of the record. The trial court also denied Appellant's trial counsel's request to question Williams about his employment application. The application was marked for identification and is included in the record.

Our independent review of the sealed file confirms that the trial court did not abuse its discretion in excluding the file. The file did not involve any credibility issues with which Appellant's trial counsel could have impeached Williams. In addition, the information Appellant's trial counsel sought to present to the jury was that Williams did not include on his application a prior investigation related to

52

specific instances of Williams's conduct. Williams testified that he was informed during his interview that he did not need to include the investigation in his application because the investigation had already been discussed during his interview. Appellant contends that the application would have shown that Williams tends to withhold information, just as he allegedly withheld information in the report that he made during the investigation into the events surrounding this case.

Appellant sought to use specific instances of Williams's conduct in order to attack his character for truthfulness. Rule 608(b) of the Texas Rules of Evidence provides that "[e]xcept for a criminal conviction under Rule 609, a party may not inquire into or offer extrinsic evidence to prove specific instances of the witness's conduct in order to attack or support the witness's character for truthfulness." TEX. R. EVID. 608(b). Thus, the trial court acted within its discretion by excluding the proffered instances to challenge Williams's truthfulness. *See Harper v. State*, No. 14-19-00736-CR, 2021 WL 5183571, at *7 (Tex. App.—Houston [14th Dist.] Nov. 9, 2021, no pet.) (mem. op., not designated for publication).

Appellant's trial counsel contends that the file offers evidence to support a theory that Williams was biased towards Mistry. On this issue, we note that Appellant's trial counsel did not offer the file in an effort to show bias on the part of Williams. Instead, Appellant's trial counsel asserted that, "The Court received a personnel file on [the witness], and I don't know if [Williams] is going to be called today or not, but our belief is there are matters contained in that that could be exculpatory." To the extent appellate counsel states that the trial court erred in excluding evidence of the file to show Williams's bias towards Mistry, we note that the content and subject of the file were wholly unrelated to the case before us and involved persons that were unrelated or possibly unknown to Mistry. Moreover, Appellant's trial counsel questioned Williams about any potential bias towards Mistry in the presence of the jury, and Williams testified that he "had no bias. I --

53

toward anyone." Upon further cross examination, Williams confirmed that he had been to Mistry's home "[m]aybe twice" and had conversations with Mistry "possibly" more than twenty times since Bernard's death. Therefore, the jury was able to consider Williams's contacts with Mistry and determine whether Williams possessed any bias in favor of Mistry or the Canady family. We overrule Appellant's nineteenth through twenty-first issues.

*Hearsay*

In his twenty-second issue, Appellant contends that the trial court abused its discretion when it admitted Nicholas's written statement over defense counsel's objection. At trial, the State offered Nicholas's statement during Officer Arguijo's testimony—after Nicholas had testified about the incident and the inconsistencies in his statement. Defense counsel objected to the admission of the statement on hearsay grounds, asserting that Nicholas was present and could testify about his statement himself. The trial court overruled defense counsel's objection. Defense counsel asserted a second objection and re-urged that the statement was inadmissible. The trial court overruled defense counsel's second objection and granted Appellant a running objection to the admission of Nicholas's statement.

Appellant asserts that the trial court erred in admitting Nicholas's statement because "[t]he State never even attempted to meet its burden of establishing an exception to the rule against hearsay that the statement would have fallen under," therefore the trial court's decision to admit the statement "was not guided by any rules of law or principles." Appellant focuses on the portions of Nicholas's statement that read, "I never saw Bernard with a knife" and "everyone was telling [Appellant] to stop shooting." Appellant asserts that he was harmed by the admission of Nicholas's statement because the State took the aforementioned portions "out of context" and used them as "substantive evidence" that Bernard did not display a knife during the incident.

54

We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. *Coble v. State*, 330 S.W.3d 253, 272 (Tex. Crim. App. 2010). We uphold the trial court's decision unless it lies outside the zone of reasonable disagreement. *Salazar v. State*, 38 S.W.3d 141, 153–54 (Tex. Crim. App. 2001). We uphold a trial court's evidentiary ruling if it is correct on any theory of law that finds support in the record. *Gonzalez v. State*, 195 S.W.3d 114, 125–26 (Tex. Crim. App. 2006); *Dering v. State*, 465 S.W.3d 668, 670 (Tex. App.—Eastland 2015, no pet.).

Both of the quotes cited by Appellant in Nicholas's statement had already been presented to the jury before the statement itself was admitted. The State questioned Nicholas about both portions of his statement during his direct examination.[14] Thus, even if Nicholas's statement was hearsay and erroneously admitted, the contents of Nicholas's statement had already been extensively discussed during Nicholas's testimony, making the statement's admission harmless if any error occurred with its admission. *See Hudson v. State*, 675 S.W.2d 507, 511 (Tex. Crim. App. 1984) ("[I]t is well settled that an error in admission of evidence is cured where the same evidence comes in elsewhere without objection."); *see also Huff v. State*, 560 S.W.2d 652, 654 (Tex. Crim. App. 1978) ("[I]f the fact to which the hearsay admitted relates is sufficiently proved by other and competent evidence, the admission of the hearsay objected to may properly be deemed harmless."); *Nicholls v. State*, 630 S.W.3d 443, 449 (Tex. App.—Eastland 2021, pet. ref'd); *Mendoza v. State*, 69 S.W.3d 628, 633 (Tex. App.—Corpus Christi–Edinburg 2002,

---

[14]We also note that both Nicholas and Officer Arguijo discredited Nicholas's statement at trial. First, Nicholas was given the opportunity to explain and correct his statement— he testified that he was not truthful throughout the entire statement; that, while his written statement was that Bernard did not have a knife, he actually did not know what Bernard had in his hand; and that no one told Appellant to stop shooting. Further, while Officer Arguijo testified that Nicholas wrote in his statement that Bernard did not have a knife, Officer Arguijo confirmed that "a knife [was] involved in this case."

pet. ref'd); *see also* TEX. R. APP. 44.2(b). Because Nicholas's statement was cumulative of other evidence, we overrule Appellant's twenty-second issue.

*Modification of Judgment*

As we previously noted, the trial court's judgment incorrectly reflects the provision of the Texas Penal Code for which Appellant was convicted. An appellate court has the power to modify the trial court's judgment to make the judgment speak the truth when it has the necessary information before it to do so. *See* TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993). Because we have the necessary information to make the judgment speak the truth, we modify the judgment of the trial court to reflect the correct statute of conviction as Section 19.02(b)(1) of the Texas Penal Code.

*This Court's Ruling*

As modified, we affirm the judgment of the trial court.


JOHN M. BAILEY
CHIEF JUSTICE


September 29, 2023

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.

# APPENDIX



**In The**

# Eleventh Court of Appeals

_____

## No. 11-19-00274-CR

_____

### DIMAS GONZALES, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the 106th District Court**
**Dawson County, Texas**
**Trial Court Cause No. 15-7565**

### O R D E R

The jury convicted Dimas Gonzales[15] of murder and assessed his punishment at confinement for a term of forty-five years in the Institutional Division of the Texas Department of Criminal Justice (TDCJ). As relevant to this order, Appellant asserts in his seventeenth issue that the trial court denied his right to a public hearing—as required by the Sixth and Fourteenth Amendments—at the evidentiary hearing on his motion for new trial. Because we find that Appellant's Sixth Amendment right

---

[15]We note that Appellant's name as it appears in the indictment is Dimas Gonzales and that the name as reflected in the judgment is Dimas Gonzalez.

to a public trial was violated, we abate this appeal and remand the cause to the trial court for a new evidentiary hearing on Appellant's motion for new trial.

*Procedural History*

Appellant filed a motion for new trial alleging, among other things, that he was deprived of the opportunity to put on a defense through the denial of expert testimony that he sought to offer, that he was convicted by a nonunanimous jury, and that the State withheld impeachment evidence for its witnesses. In connection with the hearing on the motion for new trial, Appellant was incarcerated at the time; therefore, his trial counsel filed a request for a bench warrant to procure his attendance, which the trial court denied. Instead, the trial court notified the TDCJ of Appellant's hearing and requested that Appellant have accommodations to appear by telephone. Appellant objected to the denial of the bench warrant in writing before the hearing.

Appellant was not physically present at the hearing on Appellant's motion for new trial. The trial court placed Appellant on a speaker phone and directed Appellant to "keep [his] voice up" if he asked a question or if Appellant had "something that [he] need[ed] to talk to [counsel] about." In his brief, Appellant notes that no arrangements were made for him to communicate with his counsel in a confidential manner.

When the hearing commenced, Appellant's counsel immediately objected to Appellant's absence. Appellant's counsel also objected on the grounds that the hearing was closed to the public and held in a conference room rather than in open court. The trial court summarily overruled Appellant's objections. Neither the trial court nor the State made any comment on the record about whether the hearing was closed to the public.

During the hearing, Appellant experienced a technical issue and his call temporarily dropped. After the technical issue, and during some downtime while switching between witnesses, Appellant's counsel renewed the objections:

> [DEFENSE COUNSEL]: Your Honor, in this open time, I will just make a record of the fact that we are in a conference room, that only the lawyers, the Court, the court reporter, and the witness under inquiry has been present during these entire proceedings.

> THE COURT: That's correct, counsel. And for the record, the Court allowed this Motion for New Trial to be heard rather than allowing it to be overruled by operation of law.

In total, Appellant's counsel called five witnesses at the hearing on the motion for new trial, and he introduced photographic evidence of the crime scene. At the conclusion of the hearing, the trial court denied Appellant's motion for new trial.

*Analysis*

"The Sixth Amendment of the United States Constitution guarantees an accused the right to a public trial in a criminal prosecution." *Lilly v. State*, 365 S.W.3d 321, 328 (Tex. Crim. App. 2012) (citing U.S. CONST. amend. VI); *Steadman v. State*, 360 S.W.3d 499, 504 (Tex. Crim. App. 2012) (same).[16] The right to a public trial "is necessary to insure that jurors, prosecutors, and the court are kept aware of their sense of responsibility and can properly carry out their functions." *Cameron v. State*, 490 S.W.3d 57, 61 (Tex. Crim. App. 2014) (citing *Waller v. Georgia*, 467 U.S. 39, 46 (1984)). A violation of this right is a structural error that does not require any showing of harm. *Id.*; *Lilly*, 365 S.W.3d at 328.

"Trial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials." *Dixon v. State*, 595 S.W.3d 216, 224 (Tex. Crim. App. 2020) (quoting *Presley v. Georgia*, 558 U.S. 209, 215 (2010)). "[A] trial

---

[16]We note that both *Lilly* and *Steadman* were appeals to the Texas Court of Criminal Appeals from this court.

is public, in the constitutional sense, 'when a courtroom has facilities for a reasonable number of the public to observe the proceedings.'" *Id.* at 225 (quoting *Estes v. Texas*, 381 U.S. 532, 539 (1965)).

The text of the Sixth Amendment refers to "trial." However, courts have noted that the right extends to various pretrial and posttrial proceedings. *Steadman* noted that the right extends to voir dire proceedings. 360 S.W.3d at 504 (citing *Presley*, 558 U.S. at 213). *Lilly* concerned a hearing to receive the defendant's plea bargain. 365 S.W.3d at 328. *Waller* involved a pretrial suppression hearing. 467 U.S. at 47.

The question before us is whether the right to a public trial extends to an evidentiary hearing on a motion for new trial. This appears to be a matter of first impression. In *Steadman*, the Texas Court of Criminal Appeals relied on the Supreme Court's analysis in *Waller* and *Presley* to determine whether the Sixth Amendment right to a public trial extends beyond the actual proof offered at trial. *Steadman*, 360 S.W.3d at 504. In *Waller*, the Court noted that "a suppression hearing often resembles a bench trial: witnesses are sworn and testify, and of course counsel argue their positions. The outcome frequently depends on a resolution of factual matters." *Waller*, 467 U.S. at 47. The Court also emphasized the need for an open proceeding when a defendant challenges the conduct of state actors like police and prosecutors. *Id.* In *Presley*, the Court relied on *Waller* to conclude that the right to a public trial extends to voir dire proceedings. 558 U.S. at 723–24. Thus, in determining when the right to a public trial is implicated in a non-trial proceeding, courts have often used the principles of adjudication to determine when the right attaches.

The State contends that the right to a public trial does not extend to an evidentiary hearing on a motion for new trial. To support its contention, the State cites to *Vera v. State*, 836 S.W.2d 344, 348 (Tex. App.—Amarillo 1992, no pet.),

61

and asserts that a hearing on a motion for new trial is "fundamentally a part of the post-trial review process, and not a part of the trial itself." However, we find that the State's reliance on *Vera* is misplaced. *Vera* addressed an instance where the trial court failed to timely set a hearing on a defendant's motion for new trial—allowing the motion to be erroneously overruled by operation of law. 836 S.W.2d at 348. There, the court's comment that a hearing on a motion for new trial is not "part of the trial itself" was in support of the court's remedy—an abatement—to correct an error and allow proper presentment of the cause on appeal. *Id.* Stated simply, because the error involved was a posttrial procedural error, *Vera* did not require a remand for a new trial; instead, the error could be remedied with a remand to correct a posttrial proceeding. *Id.*

We find the analysis in *Waller* to be persuasive. 467 U.S. at 47. An evidentiary hearing on a motion for new trial is analogous to the cases cited above that look to the importance of the accused's right to a public trial and the policy behind the presumption of an open court. "The purpose of a hearing on a motion for new trial is to: (1) 'decid[e] whether the cause shall be retried' and (2) 'prepare a record for presenting issues on appeal in the event the motion is denied.'" *Smith v. State*, 286 S.W.3d 333, 338 (Tex. Crim. App. 2009) (quoting *State v. Gonzalez*, 855 S.W.2d 692, 695 (Tex. Crim. App. 1993) (plurality opinion)). An evidentiary hearing on a motion for new trial is a criminal defendant's "only opportunity to present to the trial court certain matters that may warrant a new trial, and to make a record on those matters for appellate review." *Trevino v. State*, 565 S.W.2d 938, 940 (Tex. Crim. App. 1978) (discussing the right to counsel at a posttrial hearing). The Thirteenth Court of Appeals recognized that a hearing on a motion for new trial "justifies the full panoply of adversary safeguards; that is, counsel, confrontation, cross-examination, and compulsory process for witnesses." *See Lopez v. State*, 895

S.W.2d 392, 394 (Tex. App.—Corpus Christi 1994, no pet.) (citing *Trevino*, 565 S.W.2d at 940).

The evidentiary hearing on Appellant's motion for new trial involved sworn testimony of witnesses, arguments of counsel, and an allegation that "the State withheld impeachment evidence on their witnesses." These factors made the proceeding like a trial, as was the case with the suppression hearing in *Waller*. *See* 467 U.S. at 47. Accordingly, we hold that the right to a public trial under the Sixth Amendment attached to the evidentiary hearing on Appellant's motion for new trial.

The next question we must consider is whether the evidentiary hearing on Appellant's motion for new trial was closed to the public. "This is a question to be determined on a case-by-case basis in light of the totality of the evidence." *Cameron*, 490 S.W.3d at 62 (citing *Lilly*, 365 S.W.3d at 330). Appellant asserts that his hearing was closed to the public because it was held in a conference room and he had family members that were not allowed to attend. Conversely, the State contends that "all [A]ppellant's family had to do if they did wish to attend was to communicate with [A]ppellant's counsel." The State also asserts that Appellant cites to no evidence that members of the public were excluded from the conference room. However, "the focus is not on whether the defendant can show that someone was actually excluded. Rather, a reviewing court must look to the totality of the evidence and determine whether the trial court fulfilled its obligation 'to take every reasonable measure to accommodate public attendance at criminal trials.'" *Lilly*, 365 S.W.3d at 331 (quoting P*resley*, 558 U.S. at 215).

As noted in *Cameron*, "[i]t is well established that 'this Court accepts as true factual assertions made by counsel which are not disputed by opposing counsel.'" 490 S.W.3d at 62 (quoting *Thieleman v. State*, 187 S.W.3d 455, 457 (Tex. Crim. App. 2005)). Thus, we accept as true Appellant's counsel's statement that the evidentiary hearing was closed to the public. *See id.* Furthermore, the trial court

acknowledged that the hearing was closed to the public by its comment to the effect of "[t]hat's correct, counsel."

The next matter to consider is whether the trial court was justified in closing the proceeding to the public. As noted by the Texas Court of Criminal Appeals in *Cameron*, the *Waller* test is used to determine if the closure was constitutionally justified under the Sixth Amendment. *Id.* "Under *Waller*, a closure will be justified only if the trial court makes findings that closure is necessary to protect an overriding interest and the closure is narrowly tailored to protect that interest." *Id.* at 63 (citing *Waller*, 467 U.S. at 45). "A court also must consider all reasonable alternatives to closure." *Id.* (citing *Presley*, 558 U.S. at 215; *Steadman*, 360 S.W.3d at 509). When a criminal defendant's trial is closed, "[(1)] the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [(2)] the closure must be no broader than necessary to protect that interest, [(3)] the trial court must consider reasonable alternatives to closing the proceeding, and [(4)] it must make findings adequate to support the closure." *Lilly*, 365 S.W.3d at 329 (quoting *Waller*, 467 U.S. at 48) (alterations in original).

The reason offered by the trial court for closing the evidentiary hearing to the public on Appellant's motion for new trial did not justify the closure. The trial court did not cite any overriding interest like security concerns or room-size limitations that would justify closure. *See Cameron*, 490 S.W.3d at 62–63. The trial court's decision to grant a request for an evidentiary hearing on a motion for new trial is a matter of discretion. *Smith*, 286 S.W.3d at 339. We conclude that the discretionary nature of this decision does not permit the trial court to dispense with the requirement of a public trial if the trial court elects to grant a request for an evidentiary hearing on a motion for new trial. We sustain Appellant's seventeenth issue. The trial court's order denying Appellant's motion for new trial is vacated, and the cause is remanded for reconsideration of Appellant's motion in accordance with this order.

64

Rule 44.4 of the Texas Rules of Appellate Procedure provides that a court of appeals may direct a trial court to correct an error when the trial court's error prevents the proper presentation of a case on appeal. TEX. R. APP. P. 44.4 (a)–(b). This rule allows the trial court to remedy an error without requiring a new trial if the remedy will permit the appellate court to evaluate the appeal properly. *LaPointe v. State*, 225 S.W.3d 513, 520–21 (Tex. Crim. App. 2007).

We have determined that Appellant was denied his right to a public hearing on his motion for new trial. As was the case in *Vera*, the error occurred posttrial. *See Vera*, 836 S.W.2d at 348. The scope of the error was limited to the hearing on the motion for new trial, and it had no bearing on the prior stages of Appellant's trial. The appropriate remedy is to abate the appeal with instructions to the trial court to hold an evidentiary hearing on Appellant's motion for new trial that complies with the public trial requirements of the Sixth Amendment. *See Washington v. State*, 394 S.W.3d 39, 44 (Tex. App.—Houston [1st Dist.] 2012, no pet.); *Vera*, 836 S.W.2d at 348; *see also McQuarrie v. State*, 380 S.W.3d 145, 155 (Tex. Crim. App. 2012) (remanding to the trial court for a new hearing on the motion for new trial when the trial court committed errors at the first hearing).

We additionally note that Appellant asserts in his fifteenth and sixteenth issues that the trial court erred by overruling his request to be physically present at the evidentiary hearing on the motion for new trial. In light of our order remanding this matter for a new hearing on the motion for new trial, we note that Appellant has a statutory right under Article 33.03 to be "personally present" at the hearing. TEX. CODE CRIM. PROC. ANN. art. 33.03 (West 2006); *see Coons v. State*, 758 S.W.2d 330, 339 (Tex. App.—Houston [14th Dist.] 1988, pet. ref'd) ("The defendant's right of attendance also includes a hearing on a motion for new trial."); *see also Gibson v. State*, 3 Tex. Ct. App. 437, 441–42 (1878). We disagree with the State's contention that an appearance or participation by phone constitutes being personally present

under Article 33.03. There is no authority for this proposition. Additionally, the defendant's physical presence at the hearing on the motion for new trial ensures that the defendant can consult with counsel in a confidential manner and that his right to confrontation is protected.

Therefore, we abate this appeal and order the trial court to hold a new hearing on Appellant's motion for new trial within forty-five days of the date of this order in accordance with the public trial requirements of the Sixth Amendment and the statutory requirement of Article 33.03 that Appellant be physically present at the hearing. The trial court is further ordered to enter a written ruling on Appellant's motion for new trial within fifteen days of the hearing.

We further order (1) that the district clerk forward a supplemental clerk's record containing the trial court's written ruling on Appellant's motion for new trial within thirty days after the trial court files its written order and (2) that the court reporter for the 106th District Court create a supplemental reporter's record containing a transcript of the hearing and to file the supplemental reporter's record with this court within thirty days after the trial court files its written order.

Upon the filing of the supplemental clerk's record and the supplemental reporter's record with this court, the appeal will be reinstated. This court will issue further orders and instructions to the parties as necessary upon the receipt of the record from the new hearing on Appellant's motion for new trial.

It is so ordered.

JOHN M. BAILEY

August 12, 2021                    CHIEF JUSTICE

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.